James JOHNSON, Plaintiff, Appellee,

v.

WATTS REGULATOR COMPANY,
et al., Defendants, Appellants.

No. 95–1002.

United States Court of Appeals,
First Circuit.

Heard June 6, 1995.

Decided Aug. 23, 1995.

Eleanor H. MacLellan, with whom Sean M. Dunne, Ross M. Weisman, and Sulloway & Hollis were on brief, Concord, NH, for appellants.

Christopher J. Seufert, with whom Seufert Professional Association was on brief, Franklin, NH, for appellee.

Before SELYA, Circuit Judge, CAMPBELL, Senior Circuit Judge, and CYR, Circuit Judge.

SELYA, Circuit Judge.

This appeal requires us to address, for the first time, a "safe harbor" regulation promul-

gated by the Secretary of Labor (the Secretary) as a means of exempting certain group insurance programs from the strictures of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461. Determining, as we do, that the district court appropriately applied the regulation, and discerning no clear error in the court's factual findings on other issues in the case, we affirm the judgment below. 1994 WL 587801.

## I. BACKGROUND

Plaintiff-appellee James Johnson worked as a forklift operator at the Webster Valve division of defendant-appellant Watts Regulator Co. (Watts) in Franklin, New Hampshire. While so employed, plaintiff elected to participate in a group insurance program made available to Watts' employees by defendant-appellant CIGNA Employee Benefit Company d/b/a Life Insurance Company of North America (CIGNA). Under the program plaintiff received insurance protection against accidental death, dismemberment, and permanent disability. He paid the premium through a payroll deduction plan. Watts, in turn, remitted the premium payments to CIGNA.

On June 15, 1990, while a participant in the program, plaintiff sustained a severe head injury in a motorcycle accident. He remained disabled for the ensuing year, and, having crossed the policy's temporal threshold, he applied for benefits on July 17, 1991. CIGNA turned him down, claiming that he retained the residual capacity to do some work. Plaintiff then sued Watts and CIGNA in a New Hampshire state court. Postulating the existence of an ERISA-related federal question, the defendants removed the action to the district court.

Following an evidentiary hearing, the district court ruled that ERISA did not pertain. *See Johnson v. Watts Regulator Co.*, No. 92–508–JD, 1994 WL 258788 (D.N.H. May 3, 1994). Nevertheless, the court denied plaintiff's motion to remand, noting diverse citizenship and the existence of a controversy in the requisite amount. *See* 28 U.S.C. § 1332(a). The parties subsequently tried the case to the bench. The judge heard the

evidence, perused the group policy, applied New Hampshire law, found plaintiff to be totally and permanently disabled, and awarded the maximum benefit, together with attorneys' fees and costs. *See Johnson v. Watts Regulator Co.*, No. 92–508–JD, 1994 WL 587801 (D.N.H. Oct. 26, 1994). This appeal ensued.

## II. THE ERISA ISSUE

The curtain-raiser question in this case involves whether the program under which Johnson sought benefits is subject to Title I of ERISA. Confronting this issue requires that we interpret and apply the Secretary's safe harbor regulation, 29 C.F.R. § 2510.3–1(j) (1994). We divide this part of our analysis into four segments. First, we explain why the curtain-raiser question matters. Second, we limn the applicable standard of review. Third, we discuss the regulation itself and how it fits into the statutory and regulatory scheme. Fourth, we scrutinize the record and test the district court's conclusion that the program is within the safe harbor.

### A. *The ERISA Difference.*

From the earliest stages of the litigation, a controversy has raged over the relationship, if any, between ERISA and the group insurance program underwritten by CIGNA. This controversy stems from perceived self-interest: if ERISA applies, preemption is triggered, *see* 29 U.S.C. § 1144(a), and, in many situations, the substitution of ERISA principles (whether derived from the statute itself or from federal common law) for state-law principles can make a pronounced difference. For example, ERISA preemption may cause potential state-law remedies to vanish, *see, e.g., Carlo v. Reed Rolled Thread Die Co.*, 49 F.3d 790, 794 (1st Cir.1995); *McCoy v. Massachusetts Inst. of Technology*, 950 F.2d 13, 18 (1st Cir.1991), *cert. denied*, 504 U.S. 910, 112 S.Ct. 1939, 118 L.Ed.2d 545 (1992), or may change the standard of review, *see, e.g., Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1988), or may affect the admissibility of evidence, *see, e.g., Taft v. Equitable Life Assurance Soci-*

*ety,* 9 F.3d 1469, 1471–72 (9th Cir.1993), or may determine whether a jury trial is available, *see, e.g., Blake v. Unionmutual Stock Life Ins. Co.,* 906 F.2d 1525, 1526 (11th Cir. 1990).

We are uncertain which of these boggarts has captured the minds of the protagonists in this case. But exploring that question does not strike us as a prudent use of scarce judicial resources. Given the marshalled realities—the parties agree that the ERISA difference is of potential significance here; they successfully persuaded the district court to that view; and it is entirely plausible under the circumstances of this case that the applicability *vel non* of ERISA makes a meaningful difference—we refrain from speculation about the parties' tactical goals and proceed directly to a determination of whether the court below correctly concluded that state law provides the rule of decision.

### B. *Standard of Review.*

■ The question of whether ERISA applies to a particular plan or program requires an evaluation of the facts combined with an elucidation of the law. *See, e.g., Kulinski v. Medtronic Bio–Medicus, Inc.,* 21 F.3d 254, 256 (8th Cir.1994) (explaining that the existence of an ERISA plan is a mixed question of fact and law); *Peckham v. Gem State Mut.,* 964 F.2d 1043, 1047 n. 5 (10th Cir.1992) (similar). For purposes of appellate review, mixed questions of fact and law ordinarily fall along a degree-of-deference continuum, ranging from plenary review for law-dominated questions to clear-error review for fact-dominated questions. *See In re Extradition of Howard,* 996 F.2d 1320, 1327–28 (1st Cir.1993). Plenary review is, of course, nondeferential, whereas clear-error review is quite deferential. *See id.* Both standards are in play here.

The interpretation of a regulation presents a purely legal question, sparking de novo review. *See, e.g., Strickland v. Commissioner, Me. Dep't of Human Serv.,* 48 F.3d 12, 16 (1st Cir.1994); *Liberty Mut. Ins. Co. v. Commercial Union Ins. Co.,* 978 F.2d 750, 757 (1st Cir.1992). Once the meaning of the regulation has been clarified, however, the "mixed" question that remains—the regula-

tion's applicability in a given case—may require factfinding, and if it does, that factfinding is reviewed only for clear error. To that extent, the existence of an ERISA plan becomes primarily a question of fact. *See Wickman v. Northwestern Nat'l Ins. Co.,* 908 F.2d 1077, 1082 (1st Cir.), *cert. denied,* 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 586 (1990); *Kanne v. Connecticut Gen. Life Ins. Co.,* 867 F.2d 489, 492 (9th Cir.1988), *cert. denied,* 492 U.S. 906, 109 S.Ct. 3216, 106 L.Ed.2d 566 (1989).

### C. *Statutory and Regulatory Context.*

■ Congress enacted ERISA to protect the interests of participants in employee benefit plans (including the interests of participants' beneficiaries). *See* 29 U.S.C. § 1001(a) & (b); *see also Curtiss–Wright Corp. v. Schoonejongen,* —— U.S. ——, ——, 115 S.Ct. 1223, 1230, 131 L.Ed.2d 94 (1995); *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 15–16, 107 S.Ct. 2211, 2219–20, 96 L.Ed.2d 1 (1987). ERISA safeguards these interests in a variety of ways, e.g., by creating comprehensive reporting and disclosure requirements, *see* 29 U.S.C. §§ 1021–1031, by setting standards of conduct for fiduciaries, *see id.* §§ 1101–1114, and by establishing an appropriate remedial framework, *see id.* §§ 1131–1145. An integral part of the statutory scheme is a broadly worded preemption clause that, in respect to covered employee benefit plans, sets to one side "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." *Id.* § 1144(a). The purpose of the preemption clause is to enhance the efficient operation of the federal statute by encouraging uniformity of regulatory treatment through the elimination of state and local supervision over ERISA plans. *See Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 142, 111 S.Ct. 478, 484–85, 112 L.Ed.2d 474 (1990); *McCoy,* 950 F.2d at 18.

■ For an employee welfare benefit plan or program to come within ERISA's sphere of influence, it must, among other things, be "established or maintained" by an employer,[1] an employee organization, or

---

1. The statute also requires that the employer be

"engaged in commerce" or in an industry or

both. *See* 29 U.S.C. § 1002(1); *see also Wickman,* 908 F.2d at 1082 (enumerating necessary components of an ERISA plan); *Donovan v. Dillingham,* 688 F.2d 1367, 1370 (11th Cir.1982) (en banc) (same). The parties agree that the group insurance program that CIGNA wrote for Watts' employees, covering accidental death, dismemberment, and permanent disability, qualifies as a "program" of employee welfare benefits as that term is used in the statute. *See generally* 29 U.S.C. § 1002(1). Hence, the ERISA question reduces to whether the program is one "established or maintained" by an employer.

To address this very requirement, the Secretary of Labor, pursuant to 29 U.S.C. § 1135 (authorizing the Secretary to promulgate interpretive regulations in the ERISA milieu), promulgated a safe harbor regulation describing when (and to what extent) an employer or a trade union may be involved with an employee welfare benefit program without being deemed to have "established or maintained" it. *See* 40 Fed.Reg. 34,527 (1975) (explaining the rationale underlying the safe harbor regulation); *see also Silvera v. Mutual Life Ins. Co.,* 884 F.2d 423, 426 (9th Cir.1989); *see generally* Ronald J. Cooke, *ERISA Practice and Procedure* § 2.06 (1994). The regulation provides in relevant part that the term

> "employee welfare benefit plan" shall not include a group or group-type insurance program offered by an insurer to employees or members of an employee organization, under which:
>
> (1) No contributions are made by an employer or employee organization;
>
> (2) Participation [in] the program is completely voluntary for employees or members;
>
> (3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

> (4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3–1(j). A program that satisfies the regulation's standards will be deemed not to have been "established or maintained" by the employer. The converse, however, is not necessarily true; a program that fails to satisfy the regulation's standards is not automatically deemed to have been "established or maintained" by the employer, but, rather, is subject to further evaluation under the conventional tests. *See Hansen v. Continental Ins. Co.,* 940 F.2d 971, 976 (5th Cir.1991).

■ Here, we need not proceed beyond the regulation itself. The safe harbor dredged by the regulation operates on the premise that the absence of employer involvement vitiates the necessity for ERISA safeguards. In theory, an employer can assist its work force by arranging for the provision of desirable coverage at attractive rates, but, by complying with the regulation, assure itself that, if it acts only as an honest broker and remains neutral vis-a-vis the plan's operation, it will not be put to the trouble and expense that meeting ERISA's requirements entails. Failure to fulfill any one of the four criteria listed in the regulation, however, closes the safe harbor and exposes a group insurance program, if it otherwise qualifies as an ERISA program, to the strictures of the Act. *See Qualls v. Blue Cross of Cal., Inc.,* 22 F.3d 839, 843 (9th Cir.1994); *Fugarino v. Hartford Life & Accident Ins. Co.,* 969 F.2d 178, 184 (6th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1401, 122 L.Ed.2d 774 (1993); *Memorial Hosp. Sys. v. Northbrook Life Ins. Co.,* 904 F.2d 236, 241 n. 6 (5th Cir.1990); *Kanne,* 867 F.2d at 492.

In the instant case, the first, second, and fourth criteria are not in dispute. Plaintiff

activity affecting commerce. 29 U.S.C. § 1003(2). It is undisputed that Watts meets this criterion.

paid the premium without the employer's financial assistance; the decision to purchase the coverage was his and his alone; and Watts received no forbidden consideration. We concentrate, therefore, on the regulation's third facet. This is a fitting focus, as the Department of Labor has called the employer neutrality that the third facet evokes "the key to the rationale for not treating such a program as an employee benefit plan: . . . ." 40 Fed.Reg. 34,526.

■ In dealing with the regulation, courts have echoed the agency's view of the importance of employer neutrality. *See, e.g., Hensley v. Philadelphia Life Ins. Co.,* 878 F.Supp. 1465, 1471 (N.D.Ala.1995); *du Mortier v. Massachusetts Gen. Life Ins. Co.,* 805 F.Supp. 816, 821 (C.D.Cal.1992). But as the regulation itself indicates, remaining neutral does not require an employer to build a moat around a program or to separate itself from all aspects of program administration. Thus, as long as the employer merely advises employees of the availability of group insurance, accepts payroll deductions, passes them on to the insurer, and performs other ministerial tasks that assist the insurer in publicizing the program, it will not be deemed to have endorsed the program under section 2510.3–1(j)(3). *See Kanne,* 867 F.2d at 492; *du Mortier,* 805 F.Supp. at 821. It is only when an employer purposes to do more, and takes substantial steps in that direction, that it offends the ideal of employer neutrality and brings ERISA into the picture. *See, e.g., Kanne,* 867 F.2d at 492–93 (holding that an employer group crossed the line when it established a trust entity in its name for purposes of plan administration); *Brundage–Peterson v. Compcare Health Servs. Ins. Corp.,* 877 F.2d 509, 510–11 (7th Cir.1989) (finding that an employer who determined eligibility, contributed premiums, and collected and remitted premiums paid for dependents did not qualify for the safe harbor exemption); *Shiffler v. Equitable Life Assur. Soc. of U.S.,* 663 F.Supp. 155, 161 (E.D.Pa. 1986) (finding that an employer that touted a group policy to employees as part of its customary benefits package, and that specifi-

cally endorsed the policy, did not qualify for the safe harbor exemption), *aff'd,* 838 F.2d 78 (3d Cir.1988). This case falls between these extremes, and requires us to clarify the standard for endorsement under section 2510.3–1(j)(3).

The Department of Labor has linked endorsement of a program on the part of an employee organization to its engagement "in activities that would lead a member reasonably to conclude that the program is part of a benefit arrangement established or maintained by the employee organization." Dep't of Labor Op. No. 94–26A (1994).[2] What is sauce for the goose is sauce for the gander. Thus, we believe that the agency, in a proper case, will link endorsement on an employer's part to its engagement in activities that would lead a worker reasonably to conclude that a particular group insurance program is part of a benefit arrangement backed by the company.

This conclusion is bolstered by the Department's stated rationale to the effect that a communication to employees indicating that an employer has arranged for a group or group-type insurance program would constitute an endorsement within the meaning of section 2510.3–1(j)(3) if, taken together with other employer activities, it leads employees reasonably to conclude that the program is one established or maintained by the communicator. *See id.; see also* 40 Fed.Reg. 34,526 (explaining that the current phrasing of the safe harbor provision replaced an earlier version requiring that the employer make no representation to its employees that the insurance program is a benefit of employment because critics found the earlier version "too vague and difficult to apply"). In short, the agency has suggested that the employees' viewpoint should constitute the principal frame of reference in determining whether endorsement occurred.

■ The interpretation of the safe harbor regulation by the agency charged with administering and enforcing ERISA is entitled to substantial deference. *See Berkshire*

---

2. Opinion letters issued by the Secretary of Labor are not controlling even in the cases for which they are authored. *See Reich v. Newspa-* *pers of New Eng., Inc.,* 44 F.3d 1060, 1070 (1st Cir.1995). Nonetheless, courts may derive guidance from them. *See id.*

*Scenic Ry. Museum, Inc. v. ICC,* 52 F.3d 378, 381–82 (1st Cir.1995); *Keyes v. Secretary of the Navy,* 853 F.2d 1016, 1021 (1st Cir.1988). Here, moreover, the respect usually accorded an agency's interpretation of a statute is magnified since the agency is interpreting its own regulation. *See Arkansas v. Oklahoma,* 503 U.S. 91, 112, 112 S.Ct. 1046, 1060, 117 L.Ed.2d 239 (1992); *Puerto Rico Aqueduct & Sewer Auth. v. United States EPA,* 35 F.3d 600, 604 (1st Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1096, 130 L.Ed.2d 1065 (1995). So long as the agency's interpretation does not do violence to the purpose and wording of the regulation, or otherwise cross into forbidden terrain, courts should defer. *See Martin v. OSHRC,* 499 U.S. 144, 150, 111 S.Ct. 1171, 1175–76, 113 L.Ed.2d 117 (1991); *see also Stinson v. United States,* —— U.S. ——, ——, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993) (holding that an agency's interpretation of its own regulations must be given controlling weight unless plainly erroneous, inconsistent with a federal statute, or unconstitutional); *Kelly v. United States,* 924 F.2d 355, 361 (1st Cir. 1991) (similar).

In this instance, we believe that deference is due. The Secretary's sense of the safe harbor regulation is consonant with both the regulation's text and the overlying statute. And, moreover, looking at the employer's conduct from the employees' place of vantage best ensures that employer neutrality remains a reality rather than a mere illusion. Phrased another way, judging endorsement from the viewpoint of an objectively reasonable employee most efficaciously serves ERISA's fundamental objective: the protection of employee benefit plan participants and their beneficiaries.

We rule, therefore, that an employer will be said to have endorsed a program within the purview of the Secretary's safe harbor regulation if, in light of all the surrounding facts and circumstances, an objectively reasonable employee would conclude on the basis of the employer's actions that the employer had not merely facilitated the program's availability but had exercised control over it or made it appear to be part and parcel of the company's own benefit package.

### D. *Analysis.*

Here, the district court interpreted the regulation correctly and concluded that the company had not endorsed the group insurance program. This conclusion is fact-driven, and, thus, reviewable only for clear error.[3] *See Cumpiano v. Banco Santander P.R.,* 902 F.2d 148, 152 (1st Cir.1990); *see also* Fed.R.Civ.P. 52(a). Thus, the trier's findings of fact cannot be set aside unless, on reviewing all the evidence, the court of appeals is left with an abiding conviction that a mistake has been committed. *See Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 972 F.2d 453, 457 (1st Cir.1992); *Cumpiano,* 902 F.2d at 152–153. Applying this deferential standard, we cannot say that the trial court's "no endorsement" finding is clearly erroneous.

The anatomy of the court's determination is instructive. Based primarily on the testimony of two corporate officials—Watts' benefits administrator and Webster Valve's employee relations manager—the court found that the company had made its employees aware of the opportunity to obtain coverage, but had stopped short of endorsing the program. CIGNA drafted the policy and, presumably, set the premium rates. Although

**3.** The question of endorsement *vel non* is a mixed question of fact and law. In some cases the evidence will point unerringly in one direction so that a rational factfinder can reach but one conclusion. In those cases, endorsement becomes a matter of law. *Cf. Griffin v. United States,* 502 U.S. 46, 55 n. 1, 112 S.Ct. 466, 472 n. 1, 116 L.Ed.2d 371 (1991) (discussing "adequacy on the proof as made" as meaning not whether the evidence sufficed to enable an alleged fact to be found, but, rather, whether the facts adduced at trial sufficed in law to support a verdict);

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986) (describing the appropriate mode of inquiry for directed verdicts and summary judgments). In other cases, the legal significance of the facts is less certain, and the outcome will depend on the inferences that the factfinder chooses to draw. *See, e.g., TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); *In re Varrasso,* 37 F.3d 760, 763 (1st Cir.1994). In those cases, endorsement becomes a question of fact. This case is of the latter type.

Watts distributed the sales brochure, waiver-of-insurance cards, and enrollment cards, those efforts were undertaken to help CIGNA publicize the program; the documents themselves were prepared and printed by CIGNA, and delivered by it to Watts for distribution. Watts recommended enrollment via a cover letter (reproduced as an appendix hereto) written on the letterhead of Watts Industries and signed by its vice-president for financial matters. CIGNA typeset the letter and incorporated it into the cover page of the brochure. The letter explicitly informed Watts' employees that the enrollment decision was theirs to make. Watts nowhere suggested that it had any control over, or proprietary interest in, the group insurance program. And, finally, neither the letter nor any other passage in the brochure mentioned ERISA.

The district court also examined Watts' other activities concerning the program. Watts collected premiums through payroll deductions, remitted the premiums to CIGNA, issued certificates to enrolled employees confirming the commencement of coverage, maintained a list of insured persons for its own records, and assisted CIGNA in securing appropriate documentation when claims eventuated. Watts' activities in this respect consisted principally of filling out the employer portion of the claim form, inserting statistical information maintained in Watts' personnel files (such as the insured's name, address, age, classification, and date of hire), making various forms available to employees (e.g., claim forms),[4] and keeping track of employee eligibility. Watts would follow up on a claim to determine its status, if CIGNA requested that Watts do so, and would occasionally answer a broker's questions about a claim. In sum, Watts performed only administrative tasks, eschewing any role in the substantive aspects of program design and operation. It had no hand in drafting the plan, working out its structural components, determining eligibility for coverage, interpreting policy language, investigating, allow-

ing and disallowing claims, handling litigation, or negotiating settlements.

In the last analysis, the district court found that Watts' cover letter fell short of constituting an endorsement. The court pointed out that neither the letter nor the brochure expressly stated that the employer endorsed the program. Apart from the letter, the court concluded that Watts had performed only ministerial activities, and that these activities (whether viewed alone or in conjunction with the cover letter) did not rise to the level of an endorsement.

We believe that this finding deserves our allegiance. Drawing permissible inferences from the evidence, the trial court could plausibly conclude on this scumbled record that an objectively reasonable employee would not have thought that Watts endorsed the group insurance program. Several considerations lead us in this direction. We offer a representative sampling.

First, we think that endorsement of a program requires more than merely recommending it. An employer's publicly expressed opinion as to the quality, utility and/or value of an insurance plan, without more, while relevant to (and perhaps probative of) endorsement, will most often not indicate employer control of the plan. Second, the administrative functions that Watts undertook fit comfortably within the Secretary's regulation. Activities such as issuing certificates of coverage and maintaining a list of enrollees are plainly ancillary to a permitted function (implementing payroll deductions). Activities such as answering brokers' questions similarly can be viewed as assisting the insurer in publicizing the plan. Other activities that arguably fall closer to the line, such as the tracking of eligibility status, are completely compatible with the regulation's aims. Under the circumstances, the court lawfully could find that the employer's activities, in the aggregate, did not take the case out of the safe harbor.[5] *See, e.g., Brundage–*

---

4. CIGNA prepared and printed all such forms, and sent a supply of forms to Watts.

5. Appellants stress the fact that Watts unilaterally prepared and filed a Form 5500 with the Internal Revenue Service. This is an example of

the mountain laboring, but bringing forth a mouse. Such forms are informational in nature and are designed to comply with various reporting requirements that ERISA imposes. *See* Cooke, *supra*, § 3.10, at 3–34. But, there is no

*Peterson,* 877 F.2d at 510 (assuming that steps such as "distributing advertising brochures from insurance providers, or answering questions of its employees concerning insurance, or even deducting the insurance premiums from its employees' paychecks and remitting them to the insurers," do not force employers out of the safe harbor provision); *du Mortier,* 805 F.Supp. at 821 (holding that activities such as maintaining a file of informational materials, distributing forms to employees, and submitting completed forms to the insurer, do not transcend the boundaries of the safe harbor).

In arguing for reversal, appellants rely on *Hansen v. Continental Ins. Co.,* a case that involved a similar situation. In *Hansen,* as here, participation in the plan was voluntary, and premiums were paid by the employees via payroll deduction. *See Hansen,* 940 F.2d at 973. The employer collected the premiums, remitted them to the insurer, and employed an administrator who accepted claim forms and transmitted them to the carrier. *See id.* at 974. In addition, the employees received a booklet embossed with the employer's corporate logo that described the plan and encouraged employee participation. The court found that the company had endorsed the plan. *See id.*

Despite the resemblances, there are two critical facts that distinguish *Hansen* from the case at bar. First, in *Hansen* the corporate logo was embossed on the booklet itself, *see id.,* making it appear that the employer vouched for the entire brochure (and for the plan). Here, however, only Watts' letter bore its imprimatur. Second, and perhaps more cogent, the booklet at issue in *Hansen* described the policy as the company's plan,

evidence to suggest that Watts' employees knew of this protective filing, and it is surpassingly difficult for us to fathom how the filing makes a dispositive difference. Although the inference that compiling the tax form demonstrated Watts' intent to provide an ERISA plan does not escape us, *but cf. Kanne,* 867 F.2d at 493 (explaining that a brochure describing a plan as an ERISA plan evidences the intent of the employer to create an ERISA plan, but the same may not be said of the filing of a tax return), it is entirely possible, as the plaintiff suggests, that the form was filed merely as a precaution. In any event, this case turns on the employer's activities, not its intentions.

*see id.* ("our plan"), while here, the letter typeset onto the booklet describes the policy as a plan offered by another organization.[6] Though the appellants decry the distinction as merely a matter of semantics, words are often significant in determining legal rights and obligations. *See generally* Felix Frankfurter, *Some Reflections on the Reading of Statutes* 29 (1947) ("Exactness in the use of words is the basis of all serious thinking.").

In the difference between "our plan" and "a plan" lies the quintessential meaning of endorsement. If a plan or program is the employer's plan or program, the safe harbor does not beckon. *See, e.g., Sorel v. CIGNA,* 1994 WL 605726, at *2 (D.N.H. Nov. 1, 1994) (holding that statement describing policy as employer's plan on first page of plan description indicates endorsement); *Cockey v. Life Ins. Co. of N. Am.,* 804 F.Supp. 1571, 1575 (S.D.Ga.1992) (finding that when employer presents a program to its employees as an integral part of its own benefits package, the safe harbor is unavailable); *Shiffler,* 663 F.Supp. at 161 (finding endorsement because policy had been hawked to employees as a part of the company's benefits package); *see also* Dep't of Labor Op. No. 94–26A, *supra* (advising that safe harbor is unavailable when a union, *inter alia,* describes a group insurance program as its program). When, however, the employer separates itself from the program, making it reasonably clear that the program is a third party's offering, not subject to the employer's control, then the safe harbor may be accessible. *See Hansen,* 940 F.2d at 977; *Kanne,* 867 F.2d at 493; *Hensley,* 878 F.Supp. at 1471.

6. There may also be a critical difference between our approach to the question of endorsement and that adopted in *Hansen.* Although the *Hansen* court did not articulate its *ratio decidendi,* at least one district court has come to the conclusion that *Hansen* analyzed the situation from the standpoint of the employer rather than the employee. *See Barrett v. Insurance Co. of N. Am.,* 813 F.Supp. 798, 800 (N.D.Ala.1993). This possibility renders appellants' reliance on *Hansen* even more problematic.

**1138**

This distinction is sensible. When an objectively reasonable employee reads a brochure describing a program as belonging to his employer, he is likely to conclude that, if he participates, he will be dealing with the employer and that he will therefore enjoy the prophylaxis that ERISA ensures in such matters. When the possessive pronoun is eliminated in favor of a neutral article, however, the employee's perception is much more likely to be that, if he participates, he will be dealing directly with a third party—the insurer—and that he will therefore be beyond the scope of ERISA's protections.

To sum up, we are drawn to three conclusions. First, the district court did not clearly err in finding that Watts had not endorsed the group insurance program. Second, the court's fact-sensitive determination that the program fits within the parameters of the Secretary's safe harbor regulation is sustainable. Third, since ERISA does not apply, the court below did not blunder in scrutinizing the merits of plaintiff's contract claim through the prism of state law.

## III. *THE DISABILITY ISSUE*

Appellant asseverates that, even if New Hampshire law controls, the judgment below is insupportable. We turn now to this asseveration.

The starting point for virtually any claim under a policy of insurance is the policy itself. Here, the applicable rider promises benefits to an insured who has been injured in an accident, whose ensuing disability is "continuous" and "total" for a year, and who thereafter remains "permanently and totally disabled." The rider defines "continuous total disability" as a disability resulting from injuries sustained in an accident, "commencing within 180 days after the date of the accident," lasting for at least a year, and producing during that interval "the Insured's complete inability to perform every duty of his occupation."

If an insured meets this benchmark, he must then prove that he is "permanently and totally disabled." Under the policy definitions, this phrase signifies "the Insured's complete inability, after one year of continuous total disability, to engage in an occupa-

tion or employment for which [he] is fitted by reason of education, training, or experience for the remainder of his life." It is against this linguistic backdrop that we inspect appellants' assertion that the trial court erred in finding plaintiff to be totally and permanently disabled.

### A. *Standard of Review.*

 In actions that are tried to the court, the judge's findings of fact are to be honored unless clearly erroneous, paying due respect to the judge's right to draw reasonable inferences and to gauge the credibility of witnesses. *See Cumpiano*, 902 F.2d at 152 (citing Fed.R.Civ.P. 52(a)); *Reliance Steel Prods. Co. v. National Fire Ins. Co.*, 880 F.2d 575, 576 (1st Cir.1989). A corollary of this proposition is that, when there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985); *Cumpiano*, 902 F.2d at 152. In fine, when a case has been decided on the facts by a judge sitting jury-waived, an appellate court must refrain from any temptation to retry the factual issues anew.

 There are, of course, exceptions to the rule. For example, de novo review supplants clear-error review if, and to the extent that, findings of fact are predicated on a mistaken view of the law. *See, e.g., United States v. Singer Mfg. Co.*, 374 U.S. 174, 195 n. 9, 83 S.Ct. 1773, 1784 n. 9, 10 L.Ed.2d 823 (1963); *RCI N.E. Servs. Div. v. Boston Edison Co.*, 822 F.2d 199, 203 (1st Cir.1987). This does not mean, however, that the clearly erroneous standard can be eluded by the simple expedient of creative relabelling. *See Cumpiano*, 902 F.2d at 154; *Reliance Steel*, 880 F.2d at 577. For obvious reasons, we will not allow a litigant to subvert the mandate of Rule 52(a) by hosting a masquerade, "dressing factual disputes in 'legal' costumery." *Reliance Steel*, 880 F.2d at 577; *accord Dopp v. Pritzker*, 38 F.3d 1239, 1245 (1st Cir.1994), *cert. denied*, — U.S. —, 115 S.Ct. 1959, 131 L.Ed.2d 851 (1995).

## B. *Analysis.*

■ Appellants make two main arguments in regard to plaintiff's disability claim. First, in an effort to skirt Rule 52(a), they assert that the district court committed an error of law, mistaking the meaning of the phrase "permanently and totally disabled" as that phrase is used in the policy. We reject the assertion as comprising nothing more than a clumsy attempt to recast a clear-error challenge as an issue of law in hope of securing a more welcoming standard of review. The policy itself defines the operative term, and the record makes pellucid that the district judge applied the term within the parameters of that definition.

■ Appellants' second contention posits that the district court misperceived the facts, and that plaintiff was not sufficiently disabled to merit an award of benefits. This contention also lacks force. The district court had adequate grounds for deciding that plaintiff was totally and permanently disabled. The evidence showed that plaintiff sustained a devastating brain injury, and that, throughout the year following his accident, a number of physicians found his disability to be continuous. By and large, plaintiff's condition did not improve significantly during that year (or thereafter, for that matter). Without exception, the doctors concluded that he could never return to work as a forklift driver. To cap matters, the record contains ample evidence that the plaintiff's disability was permanent and blanketed the universe of occupations to which plaintiff—a laborer with a high-school education—might have aspired.

We need not cite book and verse. The court made detailed findings, crediting the conclusions of four doctors who judged plaintiff to be severely impaired, both mentally and physically.[7] The court also credited an evaluation performed by Sherri Krasner, a speech and language pathologist, and the testimony of a vocational rehabilitation counselor, Arthur Kaufman, who offered an opinion that plaintiff was unable to work without constant supervision. Kaufman stated that he did not know of a job suitable for a person in plaintiff's condition.[8] On this record, the trial court's total disability finding is unimpugnable.

Another wave of appellants' evidentiary attack targets the district court's finding that plaintiff's disability is permanent. In this respect, appellants rely mainly on the physicians' recommendations for rehabilitative therapy as indicative of the potential for recovery. The district court, however, found appellants' inference unreasonable in light of the dim prospects for significant recovery, the duration of plaintiff's inability to work, and the policy's failure to require vocational rehabilitation as a precondition to the receipt of benefits. These are fact-dominated issues, and the trial court is in the best position to calibrate the decisional scales. *See Cumpiano,* 902 F.2d at 152. Having examined the record with care, we have no reason to suspect that a mistake was committed. *See, e.g., Duhaime v. Insurance Co.,* 86 N.H. 307, 308, 167 A. 269 (1933) (explaining that, to be permanently disabled, an insured need not be in a condition of "utter hopelessness").

## IV. CONCLUSION

We need go no further. ERISA does not apply to the group insurance program at

---

7. These experts included the attending physician (Dr. Martino), a neurologist (Dr. Whitlock), a clinical neuropsychologist (Dr. Higgins), and a psychologist (Dr. Toye). A fifth physician, Dr. Michele Gaier–Rush, also evaluated plaintiff. CIGNA chose Dr. Gaier–Rush as its medical examiner but neglected to provide her with any of plaintiff's plentiful prior medical records, despite their availability. She concluded that plaintiff could not perform his usual job but could perform a job "requiring more mental capacity than physical capacity." She noted, however, that plaintiff had no formal training beyond high school, and conceded that "[t]his will probably be a permanent disability as there does not seem to have been a significant improvement in the past year." Consequently, she found it doubtful that plaintiff could ever work again.

8. While Kaufman did say that plaintiff might be able to do some gainful employment with "excessive supervision," and that plaintiff, like other patients with traumatic brain injuries, would probably benefit from vocational rehabilitation, Kaufman expressed doubt that plaintiff would ever overcome his impairment. In short, he lacked the "capacity to retain ... employment."

issue here. Moreover, the district court's factual findings survive clear-error review.

Consequently, the court's resolution of the case stands.

*Affirmed.*

## APPENDIX

WATTS INDUSTRIES, INC.

Manufacturers of Safety and Control Valves
for Plumbing, Heating, Waterworks and Industrial Markets

Hdqtrs Rte 114 & Chestnut St
No Andover MA 01845

Mail P.O. Box 628
Lawrence MA 01842
Tel (508) 688 1811
Telex 94 7480 Watts Reg Law
Fax (508) 688 2976

Dear Employees:

Your company makes available to you a program of Group Voluntary Accident Insurance which will provide protection for both occupational and non-occupational accidents.

We believe this to be an attractive program available at substantially lower cost than similar coverage purchased on an individual basis; however, the decision is, of course, entirely an individual one.

For your convenience, premiums will be collected by payroll deduction.

To be certain that all eligible employees have been given an opportunity to participate, we request that you return one of the enclosed cards indicating whether or not you wish to enroll.

Very truly yours,

WATTS INDUSTRIES, INC.

Kenneth J. McAvoy
Vice President of Finance