Glenn J. RUBIN, Plaintiff,

v.

GUARDIAN LIFE INSURANCE COMPANY OF AMERICA, Defendant.

No. 00–1501–HA.

United States District Court, D. Oregon.

June 29, 2001.

Thomas H. Tongue, Elizabeth C. Knight, Dunn Carney Allen Higgins & Tongue, Portland, OR, for Plaintiff.

Robert B. Miller, Bullivant Houser Bailey, Portland, OR, for Defendants.

## OPINION AND ORDER

HAGGERTY, District Judge.

This case is brought by a physician who is seeking to recover disability insurance benefits from defendant insurance company. Plaintiff filed this action in Multnomah County Circuit Court, and defendant removed the case to this court, asserting a federal question related to the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461. Alternatively, the exercise of federal jurisdiction also appears appropriate in light of the parties' diversity and the amount now in controversy. *See* 28 U.S.C. § 1332.

After removal, defendant moved for summary judgment against plaintiff's state claims, arguing that plaintiff's claims are precluded under ERISA. Plaintiff has filed a motion for leave to file a supplemental response that documented a medical report favorable to plaintiff's position. Defendant opposes the supplement.

## BACKGROUND

Plaintiff was employed as an anesthesiologist in 1982 by Northwest Permanente PC/Physicians & Surgeons ("NW Permanente"). During this employment, NW Permanente provided plaintiff certain in-

surance benefits as part of a benefits "package" that indisputably falls within the scope of ERISA. This package included policies for term life, health, major medical and dental insurance. The premiums for these policies were paid by NW Permanente. Subsequent to plaintiff's hire, NW Permanente made arrangements with defendant and began providing the name of defendant's disability insurance agent to employees who inquired about purchasing an individual long-term disability insurance policy. When such insurance is purchased through this agent from defendant, NW Permanente deducts the payment for the premiums from the employee's pay. Defendant also claims that the employees receive a discounted premium rate for this insurance. The parties do not dispute that NW Permanente makes no contributions toward the purchase of this insurance, purchasing the insurance is completely voluntary for NW Permanente's employees, and NW Permanente receives no consideration other than reasonable compensation for administrative services actually rendered in connection with payroll deductions. Plaintiff subsequently purchased three such policies from defendant's agent in 1990, 1991, and 1995. Plaintiff enjoyed a discounted rate for the insurance, and paid the premiums through payroll deductions.

Plaintiff allegedly developed severe depression and anxiety in early 1997, following a traumatic incident involving the death of a patient under his care. Plaintiff was not found responsible, but claims the event had a profound effect on his ability to function professionally. He elected to take a leave of absence in June, 1998, but intended to return to work in January, 1999. He later extended his leave until June, 1999, because his anxieties were unresolved.

During his leave plaintiff sought professional help. Dr. Ronald Hofeldt diagnosed plaintiff with post traumatic stress disor-der, and advised plaintiff not to return to work. Plaintiff resigned from NW Permanente and from his occupation as an anesthesiologist on June 6, 1999. His long-term disability policies state that benefits will be paid in the event of total disability, defined as being unable to perform major duties of one's occupation due to sickness or injury.

On February 17, 1999, plaintiff submitted a claim form to defendant advising the company that he was unable to perform his job due to post traumatic stress disorder. He claimed his symptoms first appeared in the fall of 1996, and that he had been totally disabled since February 3, 1999. On March 11, 1999, plaintiff submitted detailed responses to defendant's questionnaire. Defendant also reviewed a report from Dr. Hofeldt dated May 12, 1999, in which he noted that plaintiff's job had changed dramatically over the last five years, with an increase in high-risk patients and less autonomy over his practice. Defendant interviewed Dr. Hofeldt on July 9, 1999. Dr. Hofeldt reported that plaintiff was a well-respected physician until he was asked to change his practice, and the "supervision" affected him. Defendant interviewed plaintiff on July 14, 1999. Plaintiff explained that his stress was derived in part from his new surroundings and new equipment he encountered while working at different hospitals.

Defendant began paying benefits of $4,100 per month in September 1999, under a reservation of rights pending further review. Defendant subsequently interviewed Dr. Gerald Holguin, plaintiff's supervisor at Bess Kaiser and Providence–St. Vincent's hospitals. This doctor acknowledged that the work environment at St. Vincent's was more stressful, but indicated there was no effect upon plaintiff's performance, even after plaintiff's patient died.

Defendant also referred the matter to Dr. Stephen Fayer, Assistant Clinical Professor of Psychiatry, who reviewed plaintiff's records. On November 1, 1999, Dr. Fayer opined that the records did not support a diagnosis of post traumatic stress disorder for plaintiff. Instead, the records indicated to Dr. Fayer that plaintiff was experiencing a "burn-out" syndrome. Dr. Fayer reported that it is common for physicians to complain of job dissatisfaction and to become burnt out in response to the changes to managed health care systems in recent years.

On November 24, 1999, plaintiff agreed to undergo an independent medical examination with psychiatrist Thomas Dodson. Dr. Dodson concluded that plaintiff's symptoms were a result of feeling overwhelmed by the increase in stress on the job, and the effects of a less supportive environment at work. Dr. Dodson believed that plaintiff "is able to function as an anesthesiologist despite some problems in the past with depression."

On November 29, 1999, defendant obtained plaintiff's Social Security Disability file, which included a report from psychologist Gary Sacks. Dr. Sacks had examined plaintiff previously, on August 4, 1999, and then concluded that plaintiff did not suffer from post traumatic stress disorder, but instead from an adjustment disorder with mixed emotional features. The doctor believed that plaintiff's stress was due to changes in the field of medicine. This file also included a letter from Dr. Hofeldt, dated June 24, 1999, indicating that since plaintiff has stopped working, his judgment and insight are intact, and his ability to concentrate is normal.

After reviewing this additional material, Dr. Fayer submitted an updated report on January 10, 2000. He concluded that the additional material supported his earlier opinion that plaintiff is not unfit to practice medicine, but made a volitional decision not to return to work. Based upon this, defendant denied plaintiff's claims for disability on February 24, 2000. Plaintiff filed this lawsuit on September 19, 2000, in Multnomah County seeking reinstatement of the benefits.

## PENDING MOTIONS

### *Defendant's Motion for Summary Judgment*

Plaintiff's First Claim for Relief seeks payment of benefits under his disability policies; his Second Claim for Relief is for "specific performance" under those policies. Defendant moves for summary judgment on these claims, arguing that plaintiff's disability policies are part of an ERISA plan, and ERISA preempts the claims. Defendant then proceeds to seek summary judgment under ERISA, asserting that the Record establishes as a matter of law that plaintiff is not prevented by a sickness or injury from performing his job.

### *Plaintiff's Motion to Supplement*

Plaintiff seeks leave of the court to file a "supplemental response," consisting of a report from a second disability insurance provider indicating that this insurer will continue to pay disability benefits under an insurance policy plaintiff purchased from it. Defendant opposes plaintiff's motion, primarily on grounds that this is generally not permitted under ERISA.

## STANDARDS

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995), *cert. denied,*

516 U.S. 1171, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. Assuming that there has been sufficient time for discovery, summary judgment should be entered against a "party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548.

Special rules of construction apply to evaluating summary judgment motions: 1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; 2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party; and 3) the court must assume the truth of direct evidence set forth by the nonmoving party if it conflicts with direct evidence produced by the moving party. *T.W. Electrical Service v. Pacific Electrical Contractors,* 809 F.2d 626, 630 (9th Cir.1987). When different ultimate inferences can be reached, summary judgment is not appropriate. *Sankovich v. Life Ins. Co. of North America,* 638 F.2d 136, 140 (9th Cir.1981).

The issue of material fact required by Rule 56 to entitle a party to proceed to trial need not be resolved conclusively in favor of the party asserting its existence; all that is required is sufficient evidence supporting the claimed factual dispute to require a jury or judge to resolve the parties' differing versions of the truth at trial. *Id.* At this stage of the litigation, the judge does not weigh conflicting evidence or make credibility determinations. These determinations are the province of the fact finder at trial. *Id., see also Abdul–Jabbar v. Gen. Motors Corp.,* 85 F.3d 407, 410 (9th Cir.1996) (on a motion for summary judgment, the court is not to weigh the evidence or determine the truth of the matter, but only determine whether there is a genuine issue for trial).

## STANDARDS FOR ERISA CASES

 ERISA governs all employee benefit plans. 29 U.S.C. § 1001 *et seq.* An "employee benefit plan" is defined as "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan." 29 U.S.C. § 1002(3). At issue in this case is whether plaintiff's option to purchase disability policies with defendant was a component of an "employee welfare benefit plan." "ERISA defines an 'employee benefit plan' to include, among others, 'any plan, fund, or program... established or maintained by an employer... for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance... medical, surgical, or hospital care or benefits'" in the event of sickness, accident, disability, death or unemployment. *Stuart v. UNUM Life Ins. Co. of America,* 217 F.3d 1145, 1153 (9th Cir.2000), quoting *Qualls ex rel. Qualls v. Blue Cross of California, Inc.,* 22 F.3d 839, 843 (9th Cir.1994) (ellipses in original) (quoting 29 U.S.C. §§ 1002(1), (3)); *see also Crull v. GEM Ins. Co.,* 58 F.3d 1386, 1389 (9th Cir.1995); *Silvera v. Mutual Life Ins. Co. of New York,* 884 F.2d 423, 425 (9th Cir.1989); *Kanne v. Conn. Gen. Life Ins. Co.,* 867 F.2d 489, 492 (9th Cir.1988) (*per curiam*) (as amended). The existence of an ERISA plan is a factual question, to be answered from the point of view of a reasonable person. *Zavora v.*

*Paul Revere Life Ins. Co.*, 145 F.3d 1118, 1120 (9th Cir.1998) (quoting *Credit Managers Ass'n v. Kennesaw Life & Accident Ins. Co.*, 809 F.2d 617, 625 (9th Cir.1987)). A determination of whether an ERISA plan exists is made from the perspective of what an objective employee would have believed in light of the conduct of, and information provided by, the employer. *Pierson v. Continental Casualty Co.*, 2000 WL 1879895 at *7 (C.D.Cal.2000).

### A. Preemption

The question presented in this case is whether plaintiff's disability policies were part of an ERISA plan. If so, plaintiff's claims are preempted, because ERISA's relationship to state laws is governed by § 514 of the Act:

(a) Except as provided in subsection (b) of this section, the provisions of [these subchapters] shall supersede any and all State laws insofar as they . . . relate to any employee benefit plan. . . .

29 U.S.C. § 1144(a); *see also Greany v. Western Farm Bureau Life Ins. Co.*, 973 F.2d 812, 817–18 (9th Cir.1992) (ERISA contains one of the broadest preemption clauses ever enacted by Congress and supersedes all state laws relating to any employee benefit plan); *see also Harper v. American Chambers Life Ins. Co.*, 898 F.2d 1432, 1433 (9th Cir.1990). Accordingly, if defendant's disability policies are found to be within the scope of an ERISA plan, "(1) ERISA preempts the plaintiff's cause of action and (2) the cause of action falls within the scope of [ERISA's civil enforcement provision,] 29 U.S.C. § 1132(a)." *Rutledge v. Seyfarth, Shaw, Fairweather & Geraldson*, 201 F.3d 1212, 1216 (9th Cir.), *amended by* 208 F.3d 1170 (9th Cir.2000) (outlining the requirements for complete preemption under ERISA) (quoting *Emard v. Hughes Aircraft Co.*, 153 F.3d 949, 953 (9th Cir.1998), *cert. denied*, 525 U.S. 1122, 119 S.Ct. 903, 142

L.Ed.2d 902 (1999)) (internal quotation marks omitted).

### B. "Safe Harbor" provisions

The Secretary of Labor, pursuant to 29 U.S.C. § 1135 (which authorizes the Secretary to promulgate interpretive regulations regarding ERISA), has promulgated a "safe harbor" regulation describing when (and to what extent) an employer or a trade union may be involved with an employee welfare benefit program without being deemed to have "established or maintained" it. *See Johnson v. Watts Regulator Co.*, 63 F.3d 1129, 1133 (1st Cir. 1995), citing in part *Silvera v. Mut. Life Ins. Co.*, 884 F.2d 423, 426 (9th Cir.1989). The safe harbor regulations provide in relevant part that the ERISA term "employee welfare benefit plan" shall not include a group or group-type insurance program offered by an insurer to employees under which:

1. No contributions are made by an employer or employee organization;

2. Participation [in] the program is completely voluntary for employees or members;

3. The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

4. The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection

with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3–1(j).

 A program that meets these standards will be deemed not to have been "established or maintained" by the employer, and therefore would fall outside of ERISA's scope. "The converse, however, is not necessarily true; a program that fails to satisfy the regulation's standards is not automatically deemed to have been 'established or maintained' by the employer, but, rather, is subject to further evaluation under the conventional tests." *Johnson*, 63 F.3d at 1133.

The Ninth Circuit recognizes that each of these criteria must be met before an insurance plan can be excluded from ERISA coverage. *Kanne*, 867 F.2d at 491–92; *see also Stuart*, 217 F.3d at 1153 (citations omitted) (an employer's failure to satisfy one of the safe harbor's four requirements conclusively demonstrates that an otherwise qualified group insurance plan is an employee welfare benefit plan subject to ERISA); *Steen v. John Hancock Mut. Life Ins. Co.*, 106 F.3d 904, 916 (9th Cir.1997) (insurance plan could not be excluded from ERISA coverage if one of the four requirements of the safe harbor regulation was not satisfied); *Sarraf v. Standard Ins. Co.*, 102 F.3d 991, 993 (9th Cir.1996) (employer's failure to satisfy the third requirement of the safe harbor regulation conclusively demonstrated that the group insurance plan at issue could not be excluded from ERISA coverage); *Crull v. GEM Ins. Co.*, 58 F.3d 1386 (9th Cir.1995) (plan at issue was an employee welfare benefit plan under ERISA because the insured's employer contributed to and endorsed the plan); *Pacificare Inc. v. Martin*, 34 F.3d 834–35 (9th Cir.1994) (an otherwise qualified plan which fails to satisfy all four requirements of the safe harbor regulation "cannot be excluded from ERISA coverage"); *Qualls*, 22 F.3d at 843

(unless all four of the requirements for exclusion are met, the employer's involvement in a group insurance plan is significant enough to constitute an employee benefit plan subject to ERISA); *Silvera*, 884 F.2d at 426 (behavior inconsistent with one of the safe harbor's criteria constitutes evidence of an ERISA plan; employer established or maintained an employee welfare benefit plan under ERISA because it endorsed and paid premiums for the plan and because the plan was not completely voluntary).

## ANALYSIS

### I. *Defendant's Motion for Summary Judgment*

 Defendant asserts its disability policies were part of NW Permanente's employee benefit plan, and that therefore, plaintiff's state law claims must be preempted by ERISA. As already noted, three of the four safe harbor regulations that would exclude the policies from ERISA are met: Plaintiff's employer, NW Permanente, did not make any contributions to the purchase of the disability policies; participation in the coverage was completely voluntary for NW Permanente employees; and NW Permanente received no consideration other than reasonable compensation for administrative services rendered in connection with payroll deductions. Accordingly, the "safe harbor" exists, and the disability policies would not fall within ERISA, if the third regulation is met. As reviewed above, that portion of the statute preserves the safe harbor if the employer does not go beyond merely allowing an insurer to publicize a program to employees and collecting premiums through payroll deductions, and does not in anyway endorse the program.

At NW Permanente, various types of insurance are purchased for new employees as part of an ERISA benefits package. Additionally, in response to inquiries from

employees about acquiring long-term disability insurance, NW Permanente suggests the employees contact defendant's agent. Under this arrangement, employees are offered the advantage of employer-managed payment of premiums through payroll deductions, and enjoy a discount in the charged premiums. Because of this, defendant argues that an objective employee would necessarily conclude that NW Permanente endorses defendant's disability insurance policies as part of its benefits plan.

This court disagrees. By doing nothing more than advising employees of an option to purchase discounted disability insurance, and then accepting payroll deductions for employees who voluntarily purchase the coverage, NW Permanente cannot be said to have moved beyond a status of "employer neutrality" regarding this insurance option. In *Johnson,* the First Circuit addressed circumstances similar to the case at bar, where the first, second, and fourth "safe harbor" criteria were not in dispute regarding an option for employees to purchase disability insurance. The employees paid the premium without the employer's financial assistance (albeit through payroll deductions); an employee's decision to purchase the coverage was voluntary; and the employer received no "forbidden consideration." *Id.,* 63 F.3d at 1134. The question confronting the court was whether the employer remained sufficiently neutral to avoid closing the "safe harbor" and invoking ERISA:

> [A]s the regulation itself indicates, remaining neutral does not require an employer to build a moat around a program or to separate itself from all aspects of program administration. Thus, as long as the employer merely advises employees of the availability of group insurance, accepts payroll deductions, passes them on to the insurer, and performs other ministerial tasks that assist the insurer in publicizing the program, it will not be deemed to have endorsed the program under section 2510.3–1(j)(3).

*Id.,* citing in part *Kanne,* 867 F.2d at 492. The court went on to note:

> [it is] only when an employer purposes to do more, and takes substantial steps in that direction, that it offends the ideal of employer neutrality and brings ERISA into the picture. *See, e.g., Kanne,* 867 F.2d at 492–93 (holding that an employer group crossed the line when it established a trust entity in its name for purposes of plan administration); *Brundage–Peterson v. Compcare Health Servs. Ins. Corp.,* 877 F.2d 509, 510–11 (7th Cir.1989) (finding that an employer who determined eligibility, contributed premiums, and collected and remitted premiums paid for dependents did not qualify for the safe harbor exemption).

*Id.,* other citations omitted. Moreover, the court addressed circumstances in which an employer might obtain discounted premiums from an insurer for its employees, as NW Permanente did here, and still not close the safe harbor:

> In theory, an employer can assist its work force by arranging for the provision of desirable coverage at attractive rates, but, by complying with the regulation, assure itself that, if it acts only as an honest broker and remains neutral *vis-a-vis* the plan's operation, it will not be put to the trouble and expense that meeting ERISA's requirements entails.

*Id.,* citing in part *Qualls,* 22 F.3d at 843.

The record provides no grounds for concluding that NW Permanente has done anything more than "arrange for desirable coverage at attractive rates," serve as an "honest broker," and remain neutral regarding the operation of defendant's disability insurance policies. There is no evidence presented that NW Permanente had

any role in designing or implementing the policies, drafting the terms of coverage, determining eligibility for coverage, interpreting the policies, conducting investigations, evaluating claims, resolving disputed claims, or participating in claim-related or policy-related litigation. Defendant's willingness to provide NW Permanente's employees with a discount for purchasing disability insurance is insufficient, in and of itself, to establish that NW Permanente went beyond employer neutrality in its involvement with the disability insurance offer. Accordingly, this court concludes as a matter of law that NW Permanente never endorsed the long-term disability insurance policies at issue here as the term "endorse" is intended and understood at 29 C.F.R. § 2510.3–1(j), and that ERISA is inapplicable to these policies and this case. Defendant's motion for summary judgment against plaintiff's claims, which rests upon the invocation of ERISA, is denied.

■ Defendant's related motion seeking that the court should rule as a matter of law that plaintiff is not entitled to his disability insurance benefits is similarly denied. The question of plaintiff's possible disability and entitlement to benefits remains an issue of fact.

## II. *Plaintiff's Motion to Supplement*

Plaintiff seeks leave of the court to file a "supplemental response," consisting of a report from a second disability insurance provider indicating that this insurer, UnumProvident, will continue to pay plaintiff disability benefits. Defendant objects, primarily on grounds that this court should declare that plaintiff's claims are governed by ERISA and, as such, this court's review should be limited to the record that was before the administrator when the administrator made the decision that is in dispute. Defendant's objection that ERISA cases usually exclude supplemental filings is now moot. However, because there are no other motions for summary judgment pending in this action, plaintiff's request to supplement—and defendant's other objections to this request—create an evidentiary dispute that pertains to the possible admissibility of the report at trial. As such, the motion to supplement is denied as moot, with leave to renew in conjunction with the parties' upcoming pretrial filings.

## *CONCLUSION*

For the reasons provided above, defendant's motion for summary judgment (doc. # 5) is DENIED. Plaintiff's motion to supplement (doc. # 28) is denied with leave to renew. Counsel for the parties are ordered to consult and to advise the court of acceptable dates for trial no later than July 13, 2001.

IT IS SO ORDERED.