Joyce ACKERMAN, et al., Plaintiffs,

Herbert RICE,

v.

FORTIS BENEFITS INSURANCE
COMPANY, Defendant.

No. C–3–00–277.

United States District Court,
S.D. Ohio,
Western Division.

Jan. 8, 2003.

Mark Allan Anthony, Dulaney & Phillips, Dayton, OH, for Plaintiffs.

Michael Wesley Hawkins, Louise S Brock, Dinsmore & Shohl, Cincinnati, OH, Patrick W Michael, Angela Logan Edwards, Woodward Hobson & Fulton, Louisville, KY, for Defendant.

DECISION AND ENTRY SETTING FORTH FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING THE QUESTION OF WHETHER THE LONG–TERM DISABILITY BENEFITS PLAN AT ISSUE IS GOVERNED BY ERISA; DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. # 8–2) SUSTAINED IN PART AND OVERRULED IN PART; PLAINTIFF DIRECTED TO FILE, WITHIN 10 DAYS OF DATE, NOTICE OF WHETHER SHE INTENDS TO PROCEED WITH HER BREACH OF CONTRACT CAUSE OF ACTION, RE–CHARACTERIZED HEREIN AS ONE ARISING UNDER ERISA

RICE, Chief Judge.

Plaintiff Joyce Ackerman ("Ackerman"), along with her husband and son, filed the underlying civil action in the Montgomery County (Ohio) Common Pleas Court against Defendant Fortis Benefits Insurance Company ("Fortis"), alleging that Fortis wrongly denied her long-term disability benefits which she had sought on account of an alleged pregnancy-related disability. Fortis was her long-term disability insurer under a plan ("LTD plan") she had obtained while working for USAir,

Inc. ("USAir").[1] She plead five counts in her Amended Complaint (attached to Doc. # 1): bad faith (First Cause of Action), breach of contract (Second Cause of Action), intentional infliction of emotional distress (Third Cause of Action), and loss of consortium (Fourth and Fifth Causes of action, raised by Ackerman's husband and son, respectively). Fortis removed the action to this Court pursuant to 28 U.S.C. § 1441 (removal jurisdiction), asserting that the Court has original jurisdiction of the action under 28 U.S.C. § 1331 (federal question jurisdiction) and § 1332 (diversity jurisdiction). (See Doc. # 1.) The basis for Fortis's assertion of federal question jurisdiction lies in its belief that Ackerman's claims, stated in her Amended Complaint as ones arising exclusively under state law, are in fact completely preempted by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. Thereafter, on the strength of its argument that Ackerman's claims are preempted, Fortis moved for judgment on the pleadings, or alternatively for summary judgment. (See Doc. # 8.)

While not challenging the Court's jurisdiction on diversity grounds, Ackerman did challenge Fortis's assertion that her action is one arising under ERISA. The Court thus noted that while it could take jurisdiction regardless of the ERISA issue, that issue is nonetheless determinative of the procedure to be followed in considering the merits of Ackerman's Amended Complaint, to wit: if her claims are properly considered under state law, a trial on the merits would be warranted should the Court find a genuine issue of material fact; if her claims are properly construed as ones arising under ERISA, then the Court's role would be limited to a review of the decision of the plan administrator, with reference only to those materials considered by said administrator. (See Doc. # 9 at 1–2);[2] see also Wilkins v. Baptist Healthcare System, Inc., 150 F.3d 609, 613 (6th Cir. 1998)(Cole, J.); id. at 619 (Gilman, J.). Because of the existence of this issue, which has both procedural and substantive ramifications, the Court overruled Fortis's Motion for Judgment on the Pleadings (Doc. # 8–1), and directed the parties to conduct discovery on the issue of whether the LTD plan is one governed by ERISA, and to submit follow-up briefs on that issue. (See Doc. # 14.) Finding that the evidence gave rise to a genuine issue of fact even after the parties had briefed the issue, the Court scheduled an evidentiary hearing on the matter. (See Doc. # 19.)[3]

1. The Court takes judicial notice that the company formerly known as USAir now goes by the name U.S. Airways. See <http://usair-ways.com/about/corporate/ropfile/history/index.htm>. Although in prior entries the Court has referred to this entity as "US Air," adding a space between the "S" and the "A," herein, the Court will adopt what it believes to be the appropriate reference, USAir, omitting the space.

2. In framing the issue in this manner, the Court recognized the difference between the concepts of "conflict preemption" or "traditional preemption" which, where raised as a well taken defense, bars the prosecution of a state law claim, and "complete preemption," which, where well taken, serves not as a defense, but as a means of re-characterizing a colorable state law claim as a colorable ERISA claim. See, e.g., Erbaugh v. Anthem Blue Cross and Blue Shield, 126 F.Supp.2d 1079, 1081–82 (S.D.Ohio 2000). After stating its argument that the Court has federal question jurisdiction on the basis of complete preemption, Fortis moved for dismissal or summary judgment on the basis that Ackerman's claims are barred under the concept of traditional preemption. If the Court were to find the latter argument well taken, then the procedure to follow would be, of course, dismissal. As the Court will discuss below, however, Fortis is mistaken in arguing that both traditional preemption and complete preemption can attach to a single claim.

3. The Court phrased its decision as one overruling the Defendant's alternative Motion for

The Court held an evidentiary hearing on February 7, 2002, at which both parties called witnesses. The parties have since submitted post-hearing briefs on the matter (*see* Doc. #s 35, 38, & 39), and the Court conducted a post-hearing telephonic conference call on June 17, 2002, at which time the parties were afforded the opportunity to summarize their respective arguments. Fortis has maintained at all times that the LTD plan is one governed by ERISA, and that Ackerman's claims are preempted. Ackerman, to the contrary, has maintained that it is not so governed. Accordingly, she did not address the underlying question of preemption.

For the reasons which follow, the Court finds that the LTD plan at issue is one governed by ERISA. On the question of preemption, the Court finds that while Fortis is correct that several of Ackerman's state law claims are preempted in the traditional sense, such that they must be dismissed, her breach of contract claim is one properly construed as an action "completely preempted" by ERISA, such that it actually states a claim thereunder, notwithstanding the fact that it is stated in the Amended Complaint as a claim arising under the common law of Ohio. Nonetheless, what this means is that the Court's review of the "contract" claim, construed as a claim for LTD benefits, *see* 29 U.S.C. § 1132(a)(1)(B), is limited to a review of the materials actually considered by the plan administrator, and neither a summary judgment analysis nor a trial on the merits is appropriate. Accordingly, because the

parties have not given this question any attention thus far, they must be afforded the opportunity to submit memoranda of law on the merits of Ackerman's claim, including arguments on the proper standard of review to be employed by this Court in reviewing the plan administrator's decision.

Herein, the Court will first address the threshold issue of whether the LTD plan is governed by ERISA. To that end, it will set forth its findings of fact related to the evidentiary hearing. It will then set forth an opinion of law discussing the merits of the competing opinions related to that threshold issue, and, following that, will set forth its conclusions of law stemming therefrom. Finally, in a separate analysis, it will discuss the merits of Fortis's underlying Motion for Summary Judgment (Doc. # 8–2), and conclude by directing parties toward procedures to be taken in furtherance of resolving Ackerman's underlying claim, alleging breach of contract.

## I. *The Substantive Character of the LTD Plan*

On February 7, 2002, the Court held an evidentiary hearing to address the question of whether the LTD plan, under which Ackerman was an insured, is subject to the laws of ERISA. The Court will first set forth its findings of fact, followed by its opinion, and then its conclusions of law.

### A. *Findings of Fact* [4]

1. Ackerman started working for USAir on April 24, 1989, as a reservation

---

Summary Judgment (Doc. # 8–2) on the issue of whether the LTD plan is subject to ERISA. Technically speaking, the issue is not one subject to a summary judgment characterization, as it does not go toward any genuine issues related to the merits of Ackerman's claim, and a finding in favor of Fortis would not be dispositive of any claim. Accordingly, the Court's earlier ruling could probably be more accurately characterized as one turning

on the threshold issue of the *character* of the claim. (Indeed, were it not for the presence of diversity jurisdiction, the ERISA issue itself could be characterized as jurisdictional, given the fact that Ackerman's action would not otherwise be removable.)

4. Unless otherwise indicated, references are to the transcript of the evidentiary hearing held on February 7, 2002 (Doc. # 34).

agent. She continued in that position until January of 1996. (Tr. at 224.)

2. In 1989, USAir applied for and entered into the group LTD plan at issue, underwritten by The Mutual Benefit Life Insurance Company ("Mutual Benefit"), the predecessor to Fortis.[5] USAir was the master policy holder of this LTD plan. (*Id.* at 45 & Def.'s Ex. 5.)

3. In 1989, having recently merged with Piedmont Airlines ("Piedmont"), USAir submitted to Fortis (then Mutual Benefit) a request for proposal ("RFP"), explaining that it was seeking a provider of uniform long-term disability insurance benefits for its ground employees, similar in coverage to what the former Piedmont employees had had prior to their merger, and which those same employees retained in their employ with USAir. (*Id.* at 23–24.)

4. A long-term disability plan which had been offered to USAir employees through membership at the USAir Credit Union was being discontinued. (Dever Depo. (Tr. at Pl.'s Ex. 10) at 14.) [6]

5. USAir specified that it desired a plan structure which included components somewhat atypical in the LTD plan industry, and Fortis indicated to USAir that it could provide such a plan. (Tr. at 26–27.)

6. USAir selected Fortis as its LTD carrier. In furtherance of settling upon the terms of the agreement, National Group Protection ("National"), USAir's insurance broker, contacted Fortis to arrange a meeting of the respective company representatives, to be held in Crystal City, Virginia. (*Id.* at 27.)

7. Subsequently, said meeting was held, and was attended by USAir representatives from Pittsburgh and its Piedmont division, then located in North Carolina. (Tr. at 37.)

8. Several details were discussed at the Crystal City meeting, including which employees would be eligible for coverage under the LTD plan, how enrollment would be handled, how the plan would be administered, and the specific benefits that would be offered. (*Id.* at 28–29, 41.)

9. With respect to enrollment, USAir indicated that it wanted Fortis to assemble informational packets for its eligible employees, hold on-site informational meetings, prepare an informational video for employees who worked at remote sites, and establish an enrollment hotline. The determination of eligibility was left to USAir, as was the LTD plan's administration. Regarding the determination of eligibility and plan administration, it was determined that it would be incumbent upon USAir first to determine which of its employees would be eligible, and then take responsibility for benefits calculations in conformity with the benefits specifications agreed upon. In addition, it would be USAir's duty to collect premiums from its employees and remit same to Fortis, and to keep its records current. Fortis was simply not equipped to administer a plan for an employer the size of USAir, and had never done so in the past. (*Id.* at 28–30, 71, 73–74, 129.)

10. USAir submitted a preliminary application to Fortis, dated June 21, 1989, signed by its Vice President of Labor Relations, Dwayne Andrews, in which it indi-

---

**5.** References herein to Fortis should be understood as references to The Mutual Benefit Life Insurance Company if not otherwise stated and if the period of time in question would so justify, given that the business' interests passed to Fortis without any change in character. (*See* Tr. at 32.)

**6.** The October 10, 2001, deposition of Mark E. Dever was admitted into evidence at the evidentiary hearing. (Tr. at 248.)

cated that it would "self-administer" the LTD plan. (*Id.* at 32–37 & Def.'s Ex. 1.)

11. In a supplement to the LTD plan application, USAir specified that the benefits would be structured such that employees could purchase benefit amounts in increments of $100 (per month), from a minimum benefits purchase of $200, up to a maximum of $3,000, subject to the limitation that an employee could not purchase benefits totaling more than 60% of his basic monthly pay. This was an atypical benefits purchasing structure, the typical structure being one in which employees purchase benefits as a percentage of their salary, usually capped at 50 or 60%. The structure advocated by USAir mirrored the USAir Credit Union benefit plan structure. (USAir also selected a benefits qualifying period of 180 days, which was typical.) (*Id.* at 25–26, 44–45 & Def.'s Ex. 4.)

12. Effective August 1, 1989, Fortis issued the LTD policy to USAir. USAir was the designated policy holder. (*Id.* at 45 & Def.'s Ex. 5.)

13. Enrollment packets were mailed directly to the homes of eligible employees by Fortis using employee information provided by USAir. Employees were instructed to send their enrollment forms to the personnel department of the Piedmont division in North Carolina, which had experience administering the existing Piedmont plan. (*Id.* at 47, 50 & Ex. 6.)

14. The 1989 enrollment packet contained several enclosures, including a two-page memorandum, written on USAir letterhead, from USAir's Vice President of Employment Relations, William Haberkorn, addressed to all USAir and Piedmont ground employees. The subject of the memorandum read in capital letters: "OPEN ENROLLMENT FOR THE NEW USAIR LONG TERM DISABILITY INCOME PLAN." The memorandum continued: "Effective August 1, 1989, all full-time ground employees may be covered under USAir's new Long Term Disability Plan 'Performance LTD.' ...." Employees who to that time had been insured through the USAir Credit Union plan were informed that they would be enrolled automatically in the new LTD plan, at their current benefit level, unless they indicated otherwise. The last paragraph on the first page read: "Mutual Benefit Life Insurance Company is the new carrier for your plan. If you have questions, you may call Mutual Benefit Life at *1–800–776–6808*. They will have representatives who can answer your questions on eligibility, benefit amounts, etc." At the top of the second page, the memorandum stated: "We urge you to read this information carefully and consider the advantages of this important protection for you and your families in the event of a disabling illness or accident." (*Id.* at 46–50 & Def.'s Ex. 6.) (Telephone number highlighted in original.)

15. A second enclosure in the enrollment packet was a tri-fold informational brochure. USAir finalized and approved all information contained therein. The cover flap, or title flap, read: "USAir presents Performance Long Term Disability Plan." "USAir," as used in the brochure title, was styled as the USAir logo, and the word "Performance" was integrated into a graphical depiction of an airplane. The bulk of the brochure outlined the key components of the LTD plan. On the back flap, interested employees were again directed to call 1–800–776–6808, but no explicit reference to who maintained that number was provided. In the middle of the back flap, National was listed as the plan consultant, and its address and phone number were provided. At the bottom of the back flap, Mutual Benefit was listed as the plan underwriter, and its address, but no telephone number, was provided. National and Mutual Benefit were both listed

in a font substantially smaller than that used in the USAir logo on the cover flap. (*Id.* at 51 & Def.'s Ex. 7.)

16. A third enclosure was an LTD plan question and answer form ("Q & A form"). This was a five-page form, the first page of which was on USAir letterhead. All content in the Q & A form was approved by USAir. At the bottom of page five, printed in capital letters, it read: "FOR MORE INFORMATION ON USAir's 'PERFORMANCE' LONG TERM DISABILITY PLAN, CALL TOLL–FREE, 1–800–776–6808. . . ." The Q & A concluded with the following disclaimer, printed in italics: *"This pamphlet indicates the features of the plan and should only be used as a reference. USAir, Inc. holds the master group policy which contains all the provisions of the group plan and is the formal, legal contract."* The *only* mention of the carrier in the Q & A form, then Mutual Benefit, was in a description of the "rehabilitation" feature of the LTD plan, which made note of the fact that Mutual Benefit employed rehabilitation specialists to assist beneficiaries in finding suitable employment enabling them to return to the workplace. (*Id.* at 54 & Def.'s Ex. 9.)

17. A fourth and final enclosure in the enrollment packet was the enrollment form itself. The form was an NCR form manufactured in quadruplicate. The USAir logo appeared at top. Employees were offered the option of applying for LTD benefits "under the group policy issued by the Mutual Benefit Life Insurance Company," or declining the LTD benefits "offered by USAir, Inc." A space was reserved at the bottom of the form to be completed "by USAir, Inc." Of the four copies included in the quadruplicate form, one was to go to USAir, the second to National, the third also to USAir (Piedmont) for processing, and the fourth to the employee. Enrollment forms were also available upon request from Fortis. (*Id.* at 52–53, 60 & Def.'s Ex. 8.)

18. Fortis placed the USAir logo on all of the enrollment packet enclosures at the request of USAir. At that time, such was an atypical practice amongst Fortis's clients. (*Id.* at 57.)

19. Fortis representatives, along with representatives from National, conducted informational meetings at various USAir employment sites around the country. USAir provided these representatives with identification badges bearing the name "USAir Performance." (*Id.* at 57–58.)

20. An informational video which had been designed for eligible personnel in remote locations was also used at the on-site informational meetings. At the beginning of the video, the USAir logo appeared at the top of the screen. After the image of a USAir airplane flying through the air moved across the screen, the words "presents Performance Long Term Disability" appeared beneath the USAir logo, with the name "Mutual Benefit Life" appearing below that. The remainder of the video depicted USAir employees discussing the benefits of the LTD plan, at the end of which employees with more questions were encouraged to dial the same toll-free telephone number as that listed on the enrollment enclosures, which was maintained by Mutual Benefit employees. Fortis produced the video for promotional purposes, but its content was subject to the approval of USAir. (*Id.* at 59, 63, 90 & Def.'s Ex. 10 (videotape).)

21. At the request of USAir, Fortis established the toll-free number, as listed on the enrollment enclosures and in the video. It remained open as a hotline through the open-enrollment period, which was July 15, 1989, through September 15, 1989, and for two additional weeks thereafter. If employees had questions about the LTD plan after the hotline closed, they

were instructed by the message on the hotline to contact the human resources department ("HR department") at USAir. To assist the HR department, Fortis prepared a "cheat sheet" on the provisions of the LTD plan to which it could refer in answering employee questions after the enrollment period had ended. (*Id.* at 60–63 & Def.'s Exs. 6 & 11.)

22. Ackerman enrolled for coverage effective August 1, 1989. (*Id.* at Def.'s Ex. 17, at 2 & 4.)

23. In preparation for the 1990 LTD plan enrollment season, Fortis worked with USAir, at the latter's request, to re-craft the enrollment materials into a "look" which was more reflective of USAir's other benefits plan materials. (*Id.* at 64–65.)

24. Included in the 1990 enrollment materials was a memorandum, dated June 15, 1990, from USAir's then Vice President of Employee Relations, Joseph B. Wilson. The subject read: "USAir Long Term Disability Income Plan." The first paragraph read: "You asked—USAir listened! Your 'Performance' Long Term Disability plan now provides a choice of plans. You have an option of either a 90 day waiting period or a 180 day waiting period before benefits begin." Employees were informed that Mutual Benefit would again be servicing the same hotline number (800–776–6808) during the open enrollment, from June 15, 1990, through August 1, 1990. (*Id.* at 65–66 & Def.'s Ex. 14.)

25. While a benefits qualifying period (i.e., waiting period) of either 90 or 180 days was typical in the insurance industry, having the option of selecting one or the other was not. Fortis accommodated this request of USAir to suit the particular needs of its employees. (*Id.* at 66–67.)

26. The 1990 LTD plan enrollment form, which USAir assisted in developing, was captioned at its top, "USAir Long Term Disability Enrollment." The form gave the employee the option of selecting LTD coverage as "issued by the Mutual Benefit Life Insurance Company," or declining participation in the plan "offered by USAir, Inc." Three copies of the form were to be sent to USAir, Inc., 2345 Crystal Drive, Crystal Park # 4, Arlington, VA, 22227, care of Joanne Brainard in the benefits department. (*Id.* at 67–68 & Def.'s Ex. 15.)

27. The 1991 enrollment packet was mailed to eligible employees in a large white envelope, which displayed USAir's Arlington address as the return address. The subject line of the enclosed enrollment memorandum, written on USAir letterhead, read: "Annual Enrollment—USAir Long Term Disability Income Plan." The memorandum indicated that Mutual Benefit Life would again be manning the same hotline number as in years past. The enclosed plan brochure, an 8 1/2 × 11, multi-page document, was similar in appearance to other USAir benefits plan materials. The cover page incorporated USAir's corporate colors, and announced in large print, "USAir Long Term Disability Plan." Most of the information contained therein incorporated the same basic information which had been included in the tri-fold brochure and separate Q & A form used in the 1989 packet. As with the earlier tri-fold brochure, the final page of the newly designed brochure indicated that USAir owned the master policy, and that the LTD plan was underwritten by Mutual Benefit. In bright red letters it listed the same toll-free hotline number as had been used in the past, but did not indicate that it was operated by any particular party. The name, address, and phone number of National were listed in the bottom left corner, and the name and address (but not phone number) of Mutual Benefit were listed in the lower right corner. The enclosed enrollment form was again in quadruplicate. Mutual Benefit's name was listed in the top left corner; "USAir Long

Term Disability Enrollment" in the top right corner. As in the past, employees were given the option of choosing coverage under the policy "issued by" Mutual Benefit, or declining participation in the plan "offered by" USAir. At the bottom, interested employees were instructed to send three copies directly to Mutual Benefit, and a self-addressed pre-paid envelope was included for convenience. (*Id.* at 136–146 & Def.'s Ex. 20.)

28. On October 1, 1991, Western Life Insurance Company ("Western Life") assumed all rights and obligations of Mutual Benefit. Shortly thereafter, Western Life changed its name to Fortis. (*Id.* at 146–147 & Def.'s Exs. 21 & 22.)

29. The 1992 enrollment packet, inclusive of all its enclosures, replicated the 1991 packet in every material respect. The only significant alteration was the substitution of Fortis's name and contact information for that of Mutual on all of the relevant documents. (*Id.* at 148–151 & Def.'s Ex. 23.)

30. In 1993, changes to the benefits structure of the LTD plan gave rise to the publication of a 24–page certificate booklet describing the changes. The booklet, entitled "USAir Long Term Disability Plan," was distributed to all plan participants. It was issued by Fortis, but was designed to match the color format of the enrollment brochure that had first been adopted in 1991. The first page included an introductory note from Fortis's President, and listed Fortis as the issuer of the policy, and USAir as the policyholder. (*Id.* at 157–164 & Def.'s Ex. 26.)

31. The 1993 enrollment packet was very similar to the 1991 and 1992 packets, but was modified somewhat to reflect the changes to the LTD plan structure. The USAir return address on the packet envelope now indicated USAir, Benefits Administration, Pittsburgh International Airport, P.O. Box 12346, Pittsburgh, PA 15231–

0346. That year, the policy of purchasing benefit levels in $100 increments was eliminated and was replaced with the option of purchasing a benefit level at 30, 40, 50, or 60% of regular monthly earnings. Accordingly, that change was noted in the enrollment memorandum, and a "cheat sheet" was included by Fortis so that employees could calculate their applicable payroll deduction. One other difference was that the enrollment form, while still displaying "USAir Long Term Disability" in the upper right-hand corner, did not expressly provide the option of not participating in the LTD plan, and did not contain language indicating that the plan was "offered by" USAir. (*Id.* at 153–157 & Def.'s Ex. 24.)

32. The 1994 enrollment brochure incorporated substantial changes in both artwork (to match other USAir benefits materials) and substance. Displayed at the top of the cover page (first page) were the words "USAir's Long–Term Disability (LTD) insurance plan." The words "USAir-sponsored Long–Term Disability plan" were printed at the bottom. The second page discussed basic features of "USAir's Long–Term Disability (LTD) insurance plan," and indicated that the brochure was published to describe key features of the "USAir-sponsored" plan, indicating also that Fortis was the plan underwriter. The third page again referred to the plan as "USAir-sponsored." On page 9, employees were instructed to call the new "USAirLine," a toll-free telephone number (800–872–4780), to enroll. The brochure made repeated reference to the "USAirLine," and, what is more, to the fact that "USAir Benefits" representatives were available to answer questions. On page 10, another reference was made to the "USAir-sponsored" plan. The last page of the brochure instructed employees with questions to call Fortis during the enrollment season at the same

toll-free hotline which had been used in the past (800–776–6808), or at the toll-free USAirLine, which was staffed year round. Enrollment by mail was eliminated. (*Id.* at 167–175 & Def.'s Ex. 28.)

33. In 1995, the enrollment memorandum was labeled "USAir Long–Term Disability Enrollment Sheet." It did not describe the LTD plan as that of USAir, but merely as an LTD plan "provided by" Fortis. To enroll, employees were directed to call the same USAirLine telephone number as had been used in 1994. Employees with questions were once again directed to call Fortis at the same toll-free hotline which had been in use since the plan's inception. The cover-page of the 1995 brochure omitted references to USAir. All references to "USAir-sponsored" that had been used in the 1994 brochure were also omitted. However, the use of and references to the USAirLine telephone number were retained. (*Id.* at 182–185 & Def.'s Ex. 32.)

34. At every enrollment period, Fortis mailed the enrollment packets using home address information provided by USAir. (*Id.* at 172.)

35. The toll-free enrollment hotline (distinct from the toll-free USAirLine), maintained during every enrollment period, was at all times answered by Fortis employees as the "USAir hotline." At the close of an enrollment period, callers would be directed to contact the USAir benefits office. (*Id.* at 141, 150, 155 & 184.)

36. The benefits department at USAir was actively involved in the development of the 1991, 1992, 1993, 1994, and 1995 enrollment packets. However, all printing and mailing costs were borne by Fortis. (*Id.* at 152, 157, 169, 185 & 200.)

37. Fortis, not USAir, at all times retained the right to grant or deny a benefits claim. (*Id.* at 74–75.)

38. As the master policy holder, USAir, not individual plan participants, dealt with Fortis in negotiating changes to the LTD policy and the related promotional materials. As a bilateral agreement, neither USAir nor Fortis could make changes to the terms of the policy without the other's consent. (*Id.* at 75–76, 161, 165–166, 176–180, 181–182, 188, 209–214; *e.g.,* Def.'s Exs. 12, 13, 14, 16, 27, 29, 30, 31, 33, & 34; *see also* Dever Depo. at 31–32, 40–42.)

39. USAir requested that it be copied on all Fortis correspondence sent to LTD plan participants concerning claims. This was an unusual, but not unheard of, practice for the clients of Fortis. (Tr. at 112–14, 123.)

40. At the direction of USAir, Fortis would mail claim checks directly to the homes of USAir employees. Again, this was unusual but not unheard of. Its standard procedure with its other clients was to mail checks to the employer for disbursement. (*Id.* at 114–115.)

41. From April, 1995, through February, 1996, the Fortis representative in charge of the USAir account spoke with Dee Allen, his contact at USAir, on average about once a day. (*Id.* at 122.)

42. The LTD claim forms used by Ackerman, the first dated January 20, 1996, and the second dated May 31, 1996, both listed "USAir, Inc." in the top left-hand corner. The first page indicated that the information sought therein was to be completed by the insured. The second page indicated that the information sought therein was to be completed by the USAir Personnel Department. The form indicated that it was to be sent to Fortis. This claim form was generally uniform with the standardized claim form issued by Fortis. Prior to the adoption of the form of the sort completed by Ackerman, USAir had used a different version which had been

unique among Fortis's clients. (*Id.* at 103, 116–120, 124, 126 & Def.'s Ex. 17.)

43. When Fortis would deny an LTD claim, it would include ERISA appeals language in its denial letter. USAir expressed concern as to this procedure. (*Id.* at 195.)

44. Every year, Fortis would provide USAir with an IRS Form 5500, which is concerned specifically with ERISA plans. (*Id.* at 216 & Def.'s Ex. 37.)

45. Fortis takes the position that all of its benefits packages are subject to ERISA. It takes this position because of its belief that should any claim give rise to litigation, a federal forum is more favorable to it, as an insurer, than a state forum. It notified National, USAir's insurance broker, of this fact by letter dated November 9, 1995. It also notified National of its belief that the LTD plan utilized by USAir came within the terms of ERISA. (*Id.* at 131–135 & Def.'s Ex. 36.)

46. The Fortis–USAir relationship was terminated on August 1, 1996.

B. *Opinion*

■ In their various briefs and oral arguments to the Court, both parties have used the term "administered" with some frequency in the context of arguing which party, Fortis or USAir, actually administered the LTD plan. In truth, taking the term at its common meaning, the plan was co-administered. For example, USAir clearly administered the enrollment process, and was responsible for deducting premium payments from participating employees' payroll. (*See* Tr. at 187.) On the other hand, Fortis clearly administered the claims process. (*See.* Tr. at 74–75.) Yet, truth be told, this back-and-forth on the question of who administered the plan de-

tracts from the central issue. As a synopsis to the Court's opinion, it can be noted simply that Ackerman's emphasis on the fact that the LTD plan was issued and administered by Fortis is misplaced. That fact is irrelevant, as it is not even in question that the LTD plan was a Fortis plan. The question presented is whether USAir endorsed this plan, or, stated differently, whether it promoted the plan to its employees, and, in so doing, jeopardized its neutrality with respect thereto.[7] If Fortis is correct that USAir endorsed the LTD plan, then ERISA applies. If USAir is correct that it did not endorse the plan, then ERISA does not apply and the state cause of action must survive summary judgment and proceed as an action not preempted by ERISA.

The evidence adduced by Fortis at the evidentiary hearing indicates overwhelmingly that USAir endorsed the LTD plan, and there can be no question in any reasonable person's mind that Fortis met its burden of showing that USAir did not remain neutral with respect to its employees' participation in the LTD plan.

■ ERISA is a comprehensive federal law governing employee benefits. *See Thompson v. American Home Assurance Co.,* 95 F.3d 429, 434 (6th Cir.1996). 29 U.S.C. § 1002(1) states:

The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, sur-

---

7. Taking the word "endorse" at its common meaning, it means "to express definite approval or acceptance of...." Webster's Third New Int'l Dictionary (Unabridged) 749 (1976).

gical, or hospital care or benefits, or benefits in the event of sickness, accident, *disability,* death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services. . . .

(Emphasis added.) There is no dispute that the LTD plan at issue was established to provide disability benefits. Be that as it may, not all benefits plans come within the governance of ERISA.

In determining whether a plan is an ERISA plan, a district court must undertake a three-step factual inquiry. First, the court must apply the so-called "safe harbor" regulations established by the Department of Labor to determine whether the program was exempt from ERISA. *Fugarino v. Hartford Life and Accident Ins. Co.,* 969 F.2d 178, 183 (6th Cir.1992), *cert. denied,* 507 U.S. 966, 113 S.Ct. 1401, 122 L.Ed.2d 774 (1993). Second, the court must look to see if there was a "plan" by inquiring whether "from the surrounding circumstances a reasonable person [could] ascertain the intended benefits, the class of beneficiaries, the source of financing, and procedures for receiving benefits." *International Resources, Inc. v. New York Life Ins. Co.,* 950 F.2d 294, 297 (6th Cir.1991)[citation omitted]. Finally, the court must ask whether the employer "established or maintained" the plan with the intent of providing benefits to its employees. *See McDonald v. Provident Indem. Life Ins. Co.,* 60 F.3d 234, 236 (5th Cir.1995), *cert. denied,* 516 U.S. 1174, 116 S.Ct. 1267, 134 L.Ed.2d 214 (1996); *Hansen v. Continental Ins. Co.,* 940 F.2d 971, 977 (5th Cir.1991).

*Thompson,* 95 F.3d at 434–35 (alteration added).

The second and third inquiries described by the Sixth Circuit in *Thompson* are not at issue herein, i.e., Ackerman does not dispute that a benefits plan existed, and that such was established and maintained for the benefit of USAir employees. The open question is whether the Fortis LTD plan was exempt by virtue of coming within a safe harbor provision promulgated by the Department of Labor ("DOL"). Those provisions provide:

For purposes of Title I of the Act and this chapter, the terms "employee welfare benefit plan" and "welfare plan" shall not include a group or group-type insurance program offered by an insurer to employees or members of an employee organization, under which

(1) No contributions are made by an employer or employee organization;

(2) Participation [in] the program is completely voluntary for employees or members;

(3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

(4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3–1(j).

With regard to the applicability of the safe harbor provisions, it is not disputed by Fortis that safe harbor provisions (1), (2) and (4) were satisfied by USAir: Fortis does not contend that USAir made contributions to the LTD plan, that employee enrollment was anything but voluntary, or that USAir received any consideration from Fortis. The only issue is whether

USAir satisfied safe harbor provision (3), that is, whether USAir's sole functions with respect to the LTD plan included, without endorsing the plan, permitting Fortis to publicize the plan to its employees, collecting premiums through payroll deductions, and remitting those premium deductions to Fortis. Fortis asserts that USAir did not limit itself to those functions; Ackerman claims that USAir did. Without reservation, the Court agrees with Fortis.

*Thompson* is the Court's starting point. In *Thompson,* the plaintiff (Thompson) voluntarily purchased insurance from the insurer (American Home), as offered via a group life insurance plan extended to employees of Thompson's employer (Burns Security). As prefatory facts, the Sixth Circuit noted that the Burns Security personnel administrator distributed information about the American Home plan to new employees, including a brochure with its company name on the cover; that enrollment forms were returned to the administrator, who entered that employee's information into a database for purposes of calculating payroll deductions; that Burns Security contributed nothing of its own in the way of premium payments, and received no compensation from American Home other than reimbursements for administrative costs; and that American Home itself was responsible for processing claims. *Id.* at 431.

With that factual backdrop before it, the Sixth Circuit confronted the very issue disputed herein, namely, whether the employer, Burns Security, remained neutral as to its employees' participation in the American Home benefits plan, or whether it endorsed the plan. Ultimately, it found that a genuine issue existed on this question. It therefore reversed the district court's grant of summary judgment and remanded the case. The appellate court held that the key focal point is the employer's neutrality, or lack of neutrality, as to its employees' participation in a benefits plan. *Thompson,* 95 F.3d at 436. Where the employer " '[makes] it reasonably clear that the program is a third party's offering, not subject to the employer's control, then the safe harbor may be accessible.' " *Id.* (quoting *Johnson v. Watts Regulator Co.,* 63 F.3d 1129, 1137 (1st Cir.1995)). On the other hand, "a finding of endorsement is appropriate if, upon examining all the relevant circumstances, there is some factual showing on the record of substantial employer involvement in the creation or administration of the plan." *Id.* "[T]he relevant framework for determining if endorsement exists is to examine the employer's involvement or administration of the policy from the employees' point of view." *Id.* at 436–37 (citing *Johnson,* 63 F.3d at 1134 & 1137 n. 6). "[E]mphasis should be placed on those circumstances which would allow an employee to reasonably conclude that the employer had compromised its neutrality in offering the plan." *Id.* at 437. The Sixth Circuit cited with approval the following passage from *Johnson:*

> [A]s long as the employer merely advises employees of the availability of group insurance, accepts payroll deductions, passes them on to the insurer, and performs other ministerial tasks that assist the insurer in publicizing the program, it will not be deemed to have endorsed the program under [29 C.F.R. § 2510.3–1(j)].... It is only when an employer purposes to do more, and takes substantial steps in that direction, that it offends the ideal of employer neutrality and brings ERISA into the picture.

*Id.* at 436 (quoting 63 F.3d at 1134)(alteration added).

*Thompson* makes it plain that the Court's primary focus should be on what

the average, objective and reasonable USAir employee perceived. In other words, the question is whether an eligible USAir employee would have believed that USAir was endorsing Fortis's LTD plan, such that participation therein was affirmatively encouraged. Be that as it may, to some extent, certain secondary considerations are also permissible, those being participatory acts taken by USAir which were not necessarily within the knowledge of the average, eligible employee, but which a neutral outside observer, namely this Court, might regard as indicia of endorsement. This secondary review also calls for an objective analysis of USAir's participation, albeit from an alternative perspective than that of the employee.

*Thompson* again provides the basis for the Court's opinion in this regard. The principal case relied upon by the *Thompson* court in developing its own construction of what the DOL endorsement provision entails was *Johnson,* a case in which the First Circuit addressed the identical issue. In *Johnson,* as the Sixth Circuit's own reading of that case makes clear, the First Circuit focused primarily on the viewpoint of plan-eligible employees. *See* 63 F.3d at 1134–35. In so focusing, the court held that where the employer distributed plan brochures, waiver-of-insurance cards, and enrollment forms, but played no role in preparing or printing such, and where the employer recommended enrollment by way of a memorandum addressed to employees, on company letterhead and signed by a company vice-president, which itself was incorporated by the insurer into the cover page of the brochure, such conduct would not necessarily lead "an objectively reasonable employee" to believe that her employer endorsed the plan. *Id.* at 1136, 1138.[8] In

addition, it found that the employer's acts of collecting and remitting premiums, confirming plan enrollment, maintaining an employee enrollment list for its own records, completing the employer portion of the claim form, maintaining statistical data of plan enrollees, keeping track of employee eligibility, and answering the occasional claim question, were all functions it could undertake pursuant to 29 C.F.R. § 2510.3–1(j)(3) without endorsing the plan. *Id.* at 1136.

Despite the gist of both *Thompson* and *Johnson,* both the Sixth and First Circuits considered participatory acts of the respective employers that could not have been visible or apparent to their employees. For example, the Sixth Circuit noted that an employer's act of negotiating the terms of a benefits plan or the benefits provided thereunder may compromise its neutrality. *Thompson,* 95 F.3d at 436 (citing *Custer v. Pan American Life Ins. Co.,* 12 F.3d 410, 417 (4th Cir.1993) & *Wickman v. Northwestern Nat'l Ins. Co.* 908 F.2d 1077, 1083 (1st Cir.), *cert. denied,* 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 586 (1990)); *see also id.* at 437 (finding it unclear "whether Burns participated in either *devising the terms of the policy* or in processing claims") (emphasis added). It also directed its district courts to consider whether an employer was involved in the *creation* of a plan. *Id.* The *Johnson* opinion, too, contains references to acts of employer participation which could not have been within the cognizance of employees. For instance, in finding that an endorsement had not been given, it noted that the employer "performed only administrative tasks, eschewing any role in the *substantive aspects of program design and operation.*" 63 F.3d at 1136 (emphasis added).

---

8. The First Circuit did not hold that such facts could never give rise to a finding of endorsement; it held only that the district court's

factual finding that an endorsement had not been proven in that particular case was not "clear error." 63 F.3d at 1132.

"It had no hand in drafting the plan [or] working out its structural components...." *Id.* In both cases, the discussions of an employer's role in the design, creation, devise, or negotiation of plan terms implies that it is not just what an employee sees that is important.

Recognizing, in light of *Thompson* and *Johnson,* that the proper focus to be used in judging the character of the LTD plan is an objective one, with a principal focus on what an objectively reasonable employee would have believed, and a secondary focus on an objective evaluation of USAir's behind-the-scenes involvement,[9] there still remains a question of the proper temporal focus, an issue not addressed by either party. Ackerman was an LTD plan participant from 1989 until January, 1996, at which point she stopped working for USAir. Given that the question before the Court turns on a fact-sensitive inquiry, *see Johnson,* 63 F.3d at 1135, the Court assumes, though it need not decide, that the character of a benefits plan such as the one at issue can change over the course of time. For example, a corporation may play a *de minimis* role in an employee benefits plan in year 1, but decide in year 2 to involve itself to a significantly greater degree, to the extent that a lawsuit such as Ackerman's brought in year 2 would turn out differently, under the test set forth in *Thompson* and *Johnson,* than it would have had it been brought in year 1. Indeed, it was clearly Ackerman's desire to prove at the evidentiary hearing that USAir took affirmative steps in 1995 to reduce the appearance that it was endorsing the LTD plan, by removing the "USAir-sponsored" language from its enrollment brochure. (*See* Tr. at 204–209 & Def. Exs. 28 & 32.)

As noted already, the Sixth Circuit has instructed the district courts to consider "all the relevant circumstances" in determining whether an employer endorsed a plan. *Thompson,* 95 F.3d at 436. In this case, the relevant circumstances must include all those which employees would have observed over the course of Ackerman's participation in the plan. In other words, USAir's involvement from 1989 through January, 1996, must be considered in sum, and no acts of any individual year should control.

One final note on the objective employee standard set forth in *Johnson* and *Thompson* should be observed. Although it may be true that a plan's character can change from year-to-year, it is fundamental that a plan can never be, at any given time, one thing for one employee, and another thing for another. It either is or is not governed by ERISA. Ackerman argues that Fortis, in failing to call as a witness any USAir employees, failed to demonstrate how objectively reasonable employees might have interpreted the LTD plan. (*See* Pl.'s Post-Hearing Br. (Doc. # 38) at 4.) By contrast, it argues that it demonstrated such a viewpoint by calling Ackerman herself, and by introducing the deposition of Mark Dever, a benefits analyst familiar with, and after 1993 responsible for, the LTD plan at USAir. (*See* Dever Depo. at 6–9.)

Ackerman's reliance on this testimony is misplaced. Regarding Dever's deposition

---

9. One might make the argument that what the Sixth and First Circuits had intended, without expressly stating as much, is that behind-the-scenes participation may be considered to the extent it manifests itself in a manner visible to the employee. Indeed, it is logical to think that an employer's participation in the design of plan promotional or enrollment materials will lead to materials bearing corporate marks. Similarly, although participation in the design of the benefits structure itself might be somewhat more difficult to detect, a benefits plan which appears to operate in like fashion with other benefits plans offered by the employer might be assumed by a reasonable employee to be the result of her employer's participation in its development.

testimony, although a plan participant himself (see id. at 12), his perspective was obviously skewed by the fact that his job revolved around the in-house administration of benefits plans, including the LTD plan, such that how he viewed the character of the LTD plan in particular can in no fashion be deemed objective.

Ackerman's invocation of her own testimony to establish the objective viewpoint of a typical USAir employee enrolled in the LTD plan is equally unpersuasive.[10] The fact that she stated that she understood her LTD plan to be that of Fortis (see id. at 232) is of little value given her apparent confusion as to the facts (see supra note 10) and her obvious interest in the outcome of the evidentiary hearing.[11] The subjective belief of Ackerman, even if her testimony were credible, is simply a poor indicator of the objective belief of reasonable employees in general. That being the case, the fact that Fortis did not call USAir employees to testify is no more problematic to the Court's inquiry than the fact that Ackerman did not call an objective, representative pool of employee wit-

nesses of her own. At the end of the day, the trier of fact, which in this instance is the Court, is substituted as the objective employee.

In light of the evidence adduced at the evidentiary hearing, the Court finds, without a scintilla of doubt, that from 1989 through January of 1996, USAir took substantial actions with regard to the LTD plan which would have led an objectively reasonable employee to believe that it had endorsed said plan. In 1989, the year of the LTD plan's inception, USAir "urged" eligible employees "to read this information carefully and consider the advantages of this important protection for you and your families." After that, year after year, an enrollment memorandum went out to eligible employees on USAir letterhead describing the LTD plan as the "USAir Long Term Disability Plan." Year after year, the plan brochure displayed the USAir logo on its cover, in large font, followed by "Long Term Disability Plan," clearly associating the plan with the company. One year, 1994, USAir went so far as to actually state, in several places in the brochure, that the plan was USAir-sponsored. Year

**10.** In addition to the shortcomings noted in the main body of this opinion, the Court found her testimony lacking credibility. With due respect to the stress that this litigation has caused her, no doubt exacerbated by the pressures inherent in testifying in open court, the Court found that Ackerman's responses lacked specificity. Her memory of events and her understanding of the issues were both poor, as was evidenced by her inability to comprehend the meaning of the questions put to her by counsel for Fortis. For instance, she repeatedly recalled that she was first introduced to the LTD plan in 1989 by representatives from "Fortis," and that all of the materials she received and reviewed from her husband were those of "Fortis." (See Tr. at 225–229, 239–240.) This would have been impossible at that time, given the fact that Fortis did not come into existence until January of 1992. (See id. at 247 & Def.'s Ex. 22.) Her repeated and reflexive references to the

"Fortis plan" on both direct and cross examination appeared to be based not so much on her recollection of the facts as on rehearsal. Furthermore, she was clearly confused by the distinction between her act of applying for benefits and her act of submitting a claim form (see id. at 230–231, 237), and her recollection of her own claims process was essentially nonexistent. (See id. at 241–243.)

**11.** In addition to the reasons stated, it bears repeating that whether objectively reasonable employees viewed the LTD plan as a Fortis plan is irrelevant. Again, the question is not who officially administered the plan, but whether the employer's role was significant enough on its own to suggest to an objectively reasonable employee that it was endorsing his or her participation in the plan. Whether the role of Fortis was obvious to that employee is inconsequential; *the focus must remain on USAir*, and the role it played.

after year, the toll-free enrollment hotline was answered "USAir hotline," and after it shut down, callers with questions were instructed to contact the USAir human resources department. In 1994 and 1995, USAir maintained a special enrollment number, the USAirLine, which was staffed by USAir Benefits Representatives. Enrollment forms, prior to their discontinuation in 1994, and claims forms all bore USAir's logo, prominently displayed at the top. In 1993, plan participants were issued a USAir Long Term Disability certificate booklet which matched the layout of the annual enrollment brochures then in use. Promotional materials in general were designed, in both artwork and color, to match the look of other benefits plans offered by USAir. Plan participants were informed that USAir held the master policy, and that the master policy was "the legal contract" with Fortis. Plan participants themselves could not negotiate changes in coverage with Fortis.

All of these actions were obvious and visible to all eligible employees. *Taken together*, they were substantial, and under the standard set forth in *Thompson* and *Johnson*, they constitute endorsement.

The Court need not even consider the fact that USAir invited Fortis (then Mutual Benefit) to negotiate the terms of a group plan, or that USAir itself determined eligibility status, administered the premium payment aspect of the plan, and maintained its own database of participants in order to further facilitate the operation of the plan. All of these purely administrative acts are no doubt ones which an employer may undertake without leaving the safe harbor provision of 29 C.F.R. § 2510.3–1(j)(3), as highlighted by the *Johnson* case. Be that as it may, the facts recounted in the preceding paragraph differentiate this case from *Johnson*, and make it more akin to *Hansen*, 940 F.2d 971, a Fifth Circuit case also cited approvingly by the Sixth Circuit in *Thompson*. *Hansen* involved similar facts as those in *Johnson*, but the employer therein went farther by incorporating its company logo on the plan coverage booklet and describing the plan therein as "our plan." 940 F.2d at 974. As the *Johnson* court itself stated in distinguishing *Hansen*, "[i]n the difference between 'our plan' and 'a plan' lies the quintessential meaning of endorsement." *Johnson*, 63 F.3d at 1137.[12] The

**12.** In a footnote, the *Johnson* court noted a *possible* second distinction between its case and *Hansen*. Citing an opinion out of the Northern District of Alabama, the *Johnson* court noted that to the extent *Hansen* could be read for the proposition that the question of endorsement should be addressed by focusing on the employer's perspective, it disagreed with the Fifth Circuit's reasoning. *Id.* at 1137 n. 6 (citing *Barrett v. The Insurance Co. of N. Am.*, 813 F.Supp. 798, 800 (N.D.Ala. 1993)). It was the observation of this possible distinction that led the Sixth Circuit to unequivocally adopt the First Circuit's "objective employee" analytical framework. *See Thompson*, 95 F.3d at 436. Be that as it may, nothing in either *Johnson* or *Thompson* suggested that *Hansen* had to be read in the manner suggested by the *Barrett* court, and the language to which the *Barrett* court cited in its decision, as referenced by the First

Circuit in *Johnson*, demonstrates why this "possible" *legal* distinction is really not possible at all in the Sixth Circuit. *Barrett* pointed to the Fifth Circuit's finding that the employer therein "clearly signalled [sic] its intent to provide these benefits for its employees" by providing the insurance at issue as a supplement to other benefits plans already in existence. 813 F.Supp. at 800 (citing *Hansen*, 940 F.2d at 978). As pointed out earlier, in the Sixth Circuit, an employer's *intent* to "establish or maintain" a benefits plan for its employees *is a separate and distinct inquiry* from the question of endorsement, *see Thompson*, 95 F.3d at 435, and is one not disputed herein. Accordingly, the First Circuit's footnote opinion regarding the "possible" analytical framework employed by the Fifth Circuit *for purposes of addressing the question of endorsement* is of no moment. When the *Hansen* opinion is read as a whole, it appears

LTD plan at issue in this case was consistently referred to as the USAir LTD plan, and one year even as the USAir-sponsored LTD plan. If anything, such a designation publicizes an even greater level of endorsement than "our plan" does. Simply put, the facts of the case at bar begin on all fours with *Hansen*, and then goes much farther.

■ In addition to those acts of endorsement which were obvious to employees, USAir's behind-the-scenes actions also typify, in their aggregate, those of an endorsing employer. It contracted itself for employee benefits.[13] It negotiated the benefits plan structure, including the atypical manner of purchasing benefits (i.e., the $100–increment policy instead of the standard percentage-of-income policy). After the plan had been adopted, USAir actively negotiated for changes in the benefits structure. For example, it negotiated changes to the terms governing benefits waiting periods, and it resolved confusion concerning Fortis's treatment of employees who had taken advantage of USAir's "swap time" policy. (*See* Tr. at 66–67 &

209–213.) In addition, James Booth, who supervised USAir LTD plan claims for Fortis from April 1995 through February 1996, testified that he communicated with Dee Allen, his USAir counterpart, on a daily basis. Furthermore, USAir required Fortis to copy it on all claim-related correspondence to its employees. Although it would not be directly apparent to its employees that USAir was engaging in these activities, the manifestations of these actions certainly would be, more often than not, in the form of improved coverage.

Group insurance plans present a difficult choice for employers. While no expert testimony was heard on this point, the Court believes it can note that the general upside to a group plan is that, by the nature of the economic scales, such provides for lower premium costs to individual participants. Obviously, however, some party has to assume responsibility for the master policy, and the employer is the logical party to do so. For the company which does not wish to adopt an ERISA plan, this fact then leads to a potential downside, which is that it places the em-

obvious that the Fifth Circuit analyzed the question of endorsement in identical fashion as the First and Sixth Circuits, and nothing in the *Thompson* court's adoption of the First Circuit's legal standard can be read as a rejection of the Fifth Circuit's analysis in *Hansen*. Therefore, the Fifth Circuit's analysis in *Hansen* remains persuasive.

**13.** Fortis would have the Court find, on the basis of *Libbey–Owens–Ford Co. v. Blue Cross & Blue Shield Mut. of Ohio*, 982 F.2d 1031 (6th Cir.), *cert. denied*, 510 U.S. 819, 114 S.Ct. 72, 126 L.Ed.2d 41 (1993), that the mere act of contracting for employee group insurance is enough to find employer endorsement. The Court disagrees. The employer in *Libbey–Owens* was self-insured, and actually paid the claims itself, rendering the case inapposite. Similarly, the case on which *Libbey–Owens* relied, *International Res., Inc. v. New York Life Ins. Co.*, 950 F.2d 294, 298 (6th Cir. 1991), *cert. denied*, 504 U.S. 973, 112 S.Ct.

2941, 119 L.Ed.2d 565 (1992), involved an employer who not only contracted for an employee group benefits plan, but actually paid the premiums, something USAir did not do. *Accord, Fugarino v. Hartford Life and Accident Ins. Co.*, 969 F.2d 178, 184 (6th Cir.1992), *cert. denied*, 507 U.S. 966, 113 S.Ct. 1401, 122 L.Ed.2d 774 (1993). Herein, although it appears on the face of USAir's preliminary application for the LTD plan that it paid $10,000 toward the first premium (*see* Tr. at Def.'s Ex. 1), this fact was not raised at the evidentiary hearing and has not been discussed in any post-hearing arguments from Fortis. The Court is therefore hesitant to attribute to it any weight. Instead, the Court finds that *this factor alone* would provide an insufficient basis on which to declare the LTD plan an ERISA plan. "[T]he bare purchase of insurance, [without more], does not constitute an ERISA plan, although it may be evidence of the existence of an ERISA plan." *Id.* at 184 (alteration added) (citation omitted).

ployer, as the master policyholder, in the position of being the advocate for policy changes, which, in turn, could readily lead to it compromising its neutrality. One might conclude, then, that employers can never open their doors to group plans for their employees without subjecting the plan to ERISA governance, given the fact that the employer, as the master policyholder, can never remain a neutral party. Indeed, at the June 17, 2002, conference call, counsel for Ackerman argued this exact point, contending that if USAir endorsed under the facts of this case, then it must be that a large employer can never open its doors to a non-ERISA plan.

Having given the matter due consideration, the Court disagrees with the above reasoning. Cases such as *Johnson* continue to provide the model for how employers can remain within the safe harbor. An employer can be the mouthpiece for employee concerns without becoming their champion. More importantly, an employer need not affix its name and corporate logo to every piece of promotional literature. Restraining itself to opening its doors to an insurer, allowing that insurer to publicize its own benefits package, and then administering payroll deductions and premium transmissions is all that it takes for an employer to remain neutral. Nothing about Fortis insurance required USAir to actively participate in the design of the LTD plan promotional materials, or to urge its employees to enroll. Nothing required USAir to continually refer to the LTD plan as the USAir LTD plan. Noth-

ing required USAir to establish the USAir-Line to enroll its employees in a Fortis plan, or to staff that toll-free telephone number with USAir Benefits Representatives. In addition, by insisting upon certain components of the benefits structure, such as the policy of purchasing benefits in $100–increments, USAir did more than open up its doors to Fortis insurance. It crafted, at least in part, a policy of its own making.

In sum, by taking the actions it did with regard to the LTD plan, USAir endorsed the Fortis plan, thus compromising its neutrality with respect thereto. The safe harbor provision, 29 C.F.R. § 2510.3–1(j)(3), does not apply, and, therefore, the Court finds that the plan at issue was indeed an ERISA plan during the years of Ackerman's participation.[14] *E.g., Schneider v. UNUM Life Ins. Co. of Am.,* 149 F.Supp.2d 169, 181 (E.D.Pa.2001)(finding endorsement where employer took no part in plan's administration but allowed its logo to be printed on promotional material and made reference to the plan as its own); *Butero v. Royal Maccabees Life Ins. Co.,* 174 F.3d 1207, 1213 (11th Cir.1999)(finding endorsement where employer picked insurer, decided on key policy terms, regulated employee eligibility, incorporated terms into summary description of its own cafeteria plan,[15] and retained power to alter compensation reduction for tax purposes).

---

**14.** Ackerman makes much of the fact that Fortis treats all insurance plans which it offers to employers as ones governed by ERISA. (*See* Tr. at Def.'s Ex. 36.) Although the piece of evidence on which Ackerman relies is certainly a good indicator of Fortis's stock position, it is irrelevant. As should be clear by this point, the deeds of the employer, viewed objectively, control the outcome. Just as the intent of an employer does not control the analysis, *a fortiori* the intent of the insurer

does not control. Equally so, it matters not whether USAir filed the IRS Form 5500s submitted to it by Fortis (Tr. at 216–217); such relates to its intent, not to how its participation with the plan was perceived by its employees.

**15.** The employer's cafeteria plan was an omnibus package of various benefits plans. *Butero,* 174 F.3d at 1210.

## C. *Conclusions of Law*

1. The only issue before the Court is whether the level of USAir's involvement with the LTD plan exceeded that allowable under the DOL safe harbor provisions, and more specifically, whether USAir endorsed the LTD plan.

2. USAir's involvement went beyond that which is allowable under the "no endorsement" safe harbor provision, 29 C.F.R. § 2510.3–1(j)(3).

3. By participating in the design, promotion, administration, and control of the LTD plan, to the extent that it did, USAir did substantially more than permit Fortis to publicize the LTD plan to employees, collect premiums through payroll deductions, and remit those premiums to Fortis. USAir's substantial involvement compromised its neutrality to the plan.

4. From April of 1989 through January of 1996, an objective, reasonable employee would have found that USAir endorsed Fortis's LTD plan offered to USAir employees.

5. The Fortis LTD plan was an ERISA plan.

## II. *Fortis's Underlying Motion for Summary Judgment (Doc. # 8–2)*

Having determined that Ackerman's long-term disability insurance plan was covered by ERISA, it remains to be addressed how to treat her cause of action, given the fact that no ERISA claim was stated in her Amended Complaint. Fortis argues that it should be dismissed in its entirety as preempted by ERISA. Ackerman concentrated her argument solely on the issue of whether the LTD plan was governed by ERISA, contending that it was not. She did not submit a separate argument on how her claim should be

treated by the Court were it deemed one governed by ERISA. For the reasons stated below, the Court finds that all of Ackerman's claims but that for breach of contract must be dismissed on summary judgment, on the basis that she cannot show a genuine issue of material fact with respect thereto, given that they are preempted by ERISA under traditional notions of conflict preemption.[16] The breach of contract claim, on the other hand, is completely preempted by ERISA, a different matter entirely, and therefore states a claim under ERISA such that it presents a viable claim on which Ackerman may proceed. After discussing the preemption issue, the Court will address further procedures that need to be taken in furtherance of resolving this litigation.

## A. *Preemption and Complete Preemption*

■ As indicated at the beginning of this Decision and Entry, Ackerman's Amended Complaint states five counts or claims for relief under the laws of Ohio, the first for bad faith, the second for breach of contract, the third for intentional infliction of emotional distress, and the fourth and fifth for loss of consortium. The facts indicate that Ackerman's only relationship with Fortis is that which exists on account of it being her insurer. All of her claims arise out of the terms of the LTD plan; there is no claim based on an independent tort or contract.

Section 514(a) of ERISA, 29 U.S.C. § 1144(a), states:

> Except as provided in subsection (b) of this section, the provisions of this subchapter ... shall supercede any and all State laws insofar as they now or hereafter relate to any employee benefit plan

---

**16.** A motion to dismiss would have been the more appropriate procedural device for Fortis to invoke.

described in section 1003(a) of this title and not exempt under section 1003(b) of this title. * * *

Because USAir is clearly an employer engaged in commerce or in an industry affecting commerce, the LTD plan at issue comes within the scope of 29 U.S.C. § 1003(a), and it is not exempt under § 1003(b).[17] Nor does Ackerman's suit relate to an Ohio law which regulates insurance, banking, or securities, such that it might come within ERISA's savings clause (§ 514(b)).

■ Section 514(a), ERISA's preemption clause, is a broad-sweeping provision. *See Pilot Life Ins. v. Dedeaux*, 481 U.S. 41, 47, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). An employee's only remedies under ERISA are those provided by § 502(a), 29 U.S.C. § 1132(a), which include, among other things, her right to recover benefits according to the terms of the plan, or to enforce or clarify her rights under the same. *See id.* at 52, 107 S.Ct. 1549. At the end of the day, the Court in this case is being called upon to evaluate the correctness of Ackerman's treatment under the terms of the LTD plan, an ERISA plan. Because her claims relate to an ERISA plan, they are, with one significant exception, preempted pursuant to *traditional notions of preemption.*[18] *See Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985); *e.g., Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990); *Pilot Life, supra; Smith v. Provident Bank*, 170 F.3d 609 (6th Cir.1999). For the reasons given below, the exception is Ackerman's Second Cause of Action, for breach of contract. With respect to her other claims, for bad faith, intentional infliction of emotional distress, and loss of consortium, Fortis's Motion for Summary Judgment is SUSTAINED, as Ackerman cannot demonstrate a genuine issue of material fact as a matter of law.

■ Because the Court finds that Ackerman's claim for breach of contract is completely preempted by ERISA, as compared to traditionally preempted, such that it states a claim under § 502(a), dismissal would be inappropriate. The correct approach is to adjudicate the claim as one for benefits arising under ERISA, with reference to the administrative record.

■ In *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 66–67, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987), the Supreme Court held that a claim which could be raised under § 502(a), but which is actually stated in the complaint as a claim arising under state law, is completely preempted by ERISA, such that it necessarily states a federal claim. 481 U.S. at 66–67, 107 S.Ct. 1542. As such, the Supreme Court held that such an action, where filed in state court, is removable to federal court pursuant to 28 U.S.C. § 1441. *Id.* at 67, 107 S.Ct. 1542. This latter point is important. The traditional rule of preemption is that where it is arguable that a federal law preempts a state law, that argument is properly raised as a defense to the state cause of action, *in state court. See Louisville & Nashville R. Co. v. Mottley*, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908). The rule of *Taylor* is an exception to that general rule, and is based on the proposition that a cause of action which

17. That section exempts (1) governmental plans, (2) certain church plans, (3) plans related to workers' compensation laws, (4) plans maintained outside of the United States for nonresidents, and (5) unfunded excess benefits plans.

18. What the Court refers to as "traditional" preemption is also referred to frequently in the cases as "conflict," "defensive," "ordinary," or "substantive" preemption.

*could* state a claim under § 502(a) "is purely a creature of federal law," and that the preemptive effect of the law "is so powerful as to displace entirely any state cause of action." [19]  *Taylor* at 64, 107 S.Ct. 1542 (quoting *Franchise Tax Bd. of Cal. v. Construction Laborers Trust for Southern Cal.*, 463 U.S. 1, 23, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)).

The complete preemption issue is of the utmost importance in removal cases where there is no alternative basis for federal court jurisdiction, because whether the alleged state law claim actually states a claim under ERISA becomes the jurisdictional question itself. *See Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 467–68 & n. 11 (6th Cir.2002).[20]

How to treat a state law claim once it has been removed to federal court on the basis of complete preemption is an interesting issue which has created a split of opinion in the federal courts. Some courts have held that a completely preempted claim is necessarily preempted under traditional preemption principles, such that the claim must be dismissed after removal to the federal court. *See, e.g., Butero*, 174 F.3d at 1215; *Lister v. Stark*, 890 F.2d 941, 944 (7th Cir.1989), *cert. denied*, 498 U.S. 1011, 111 S.Ct. 579, 112 L.Ed.2d 584 (1990). Other courts have held that a completely preempted claim is viable under federal law not only for removal purposes but also for purposes of allowing the plaintiff to proceed with the litigation, albeit subject to ERISA rules. *See, e.g., Crull v. GEM Ins. Co.*, 58 F.3d 1386, 1392 (9th Cir.1995); *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir.1992);[21]  *Carland v. Metropolitan Life Ins. Co.*, 935 F.2d 1114, 1119 (10th Cir.), *cert. denied*, 502 U.S. 1020, 112 S.Ct. 670,

19. The Supreme Court held that it was clearly Congress' intent that causes of action which could be brought pursuant to ERISA, should be. *Taylor*, 481 U.S. at 66, 107 S.Ct. 1542. The Court reached its decision with reference to its holding in *Avco Corp. v. Machinists*, 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968), wherein it first recognized the complete preemption doctrine. In *Avco*, the Supreme Court held that where nominal state-law claims could have been plead under the National Labor Management Relations Act, 29 U.S.C. § 185, they necessarily state federal claims thereunder. 390 U.S. at 560, 88 S.Ct. 1235.

20. Actions filed in state court are only removable to federal court if the federal court to which the action is removed would have "original jurisdiction" over such a claim. *See* 28 U.S.C. § 1441(a). Under the well-pleaded complaint rule, the plaintiff is the master of his complaint, and if a federal defense exists to a state-court action, it must be raised in state court; it is not a basis for removal, given the fact that, generally, the defense would not be obvious on the face of the complaint. *See Taylor*, 481 U.S. at 63–64, 107 S.Ct. 1542. As an exception to the well-pleaded complaint rule, the complete preemption doctrine provides for removal because the claim itself is construed as "necessarily federal in character by virtue of the clearly manifested intent of Congress," *id.*, 481 U.S. at 67, 107 S.Ct. 1542, thus giving the federal court original jurisdiction pursuant to 28 U.S.C. § 1331.

21. Interestingly, in *Bartholet*, the Seventh Circuit rested its complete preemption analysis on its holding in *Lister, supra*, yet mysteriously forgot all about *Lister* when it came time to consider whether the completely preempted claim should have been dismissed. Whereas in *Lister* it stated that claims which are completely preempted "are substantively preempted as well," 890 F.2d at 944, it held in *Bartholet* that where the claim obviously states a claim under § 502(a), as the defendant itself had argued for purposes of establishing removal jurisdiction, "[i]t does not follow ... that Bartholet's suit should have been dismissed under Rule 12(b)(6)." 953 F.2d at 1077. "Removal depended on a conclusion that the complaint, *as filed*, arose under federal law. What would be the point of amending the complaint to make explicit what the district judge has held is the only possible interpretation of the document?" *Id.* at 1078 (emphasis in original).

116 L.Ed.2d 761 (1991); *Murphy v. Metropolitan Life Ins. Co.*, 152 F.Supp.2d 755, 758 (E.D.Pa.2001); *Carpenter v. CNA, Continental Casualty Co.*, Case No. C–3–00–398 (S.D.Ohio March 18, 2002) (Decision and Entry Overruling Defendant's Motion to Dismiss and Overruling Plaintiff's Motion for Summary Judgment; Directive to Plaintiff to File Memorandum for Judgment on the Merits of the Administrative Record). Still other courts fall somewhere in the middle, allowing the plaintiff leave to amend the complaint to state an ERISA claim expressly. *See, e.g., Erbaugh v. Anthem Blue Cross and Blue Shield*, 126 F.Supp.2d 1079, 1082 (S.D.Ohio 2000); *Whitt v. Sherman Int'l Corp.*, 147 F.3d 1325, 1328 (11th Cir.1998); *Shea v. Esensten*, 107 F.3d 625, 627 (8th Cir.), *cert. denied*, 522 U.S. 914, 118 S.Ct. 297, 139 L.Ed.2d 229 (1997); *Degnan v. Publicker Indus., Inc.*, 83 F.3d 27, 30 (1st Cir.1996).

This Court finds that the approach of the first group rests on a serious misunderstanding of the complete preemption doctrine. With respect to the approaches of the second and third groups, although they essentially lead to the same result, and while this Court has recognized both approaches in the past, only the second approach actually honors the conceptual undergirding of the complete preemption doctrine as announced in *Taylor*, and the Court therefore follows the holdings of the courts in that group.

There is no doubt that a claim for breach of contract arising out of an ERISA plan is within the preemptive scope of § 514(a), i.e., there is no doubt that it "relates to" the ERISA plan. Simple as that observation may be, courts have also held that such a claim is nothing more than one for benefits, which can be entertained under § 502(a). *See, e.g., Taylor*, 481 U.S. at 62–63, 107 S.Ct. 1542; *Nester v. Allegiance Healthcare Corp.*, 162 F.Supp.2d 901, 905 (S.D.Ohio 2001); *Gordon v. Barnes Pumps, Inc.*, 999 F.2d 133 (6th Cir.1993); *Murphy*, 152 F.Supp.2d at 758; *Butero*, 174 F.3d at 1211, 1212; *Sorosky v. Burroughs Corp.*, 826 F.2d 794, 800 (9th Cir.1987). *Cf. Peters*, 285 F.3d at 468–69 (holding that the plaintiff's claim that the ERISA plan administrator breached its promise to provide him with coverage was nothing more than a claim for benefits under § 502(a)).

Under the complete preemption doctrine, claims which *could* be stated under § 502(a) *are* stated thereunder. The question presented herein, then, is whether a state law claim, once re-characterized as an ERISA claim, must be dismissed in federal court, because the complaint still states on its face only a state law claim, or whether the plaintiff can proceed, albeit subject to the constraints of ERISA (with or without filing an amended complaint to expressly state the ERISA claim). The Sixth Circuit, so far as this Court can discern, has never addressed this question directly. The Court will turn its attention first to those courts which have held that once a claim has been removed to federal court on the basis of complete preemption, and re-characterized as an ERISA claim, it should then be dismissed pursuant to traditional preemption.

In *Butero, supra*, the Eleventh Circuit held that several claims, including one for breach of contract, essentially stated alternative grounds for recovering benefits under an ERISA plan, and were therefore completely preempted because they could have been asserted under § 502(a). 174 F.3d at 1211–13. Accordingly, the Court held that the claims, initially plead in state court, were removable. *Id.* at 1215. The Eleventh Circuit then stated: "If the plaintiff's claims are superpreempted [i.e., completely preempted], then they are also defensively [i.e., traditionally] preempted." *Id.* (alterations added). Therefore, the

Eleventh Circuit concluded that the district court had properly dismissed the plaintiff's claims. *Id.; accord, Lister,* 890 F.2d at 944. In so holding, the *Butero* court cited the Fifth Circuit's opinion in *McClelland v. Gronwaldt,* 155 F.3d 507 (5th Cir.1998). This citation is questionable. The *Gronwaldt* court merely held that in the Fifth Circuit, before a court reaches the question of complete preemption, it must first find that the claim would be preempted under § 514(a). 155 F.3d at 517. In other words, it held that courts must conduct a two-part test, and find that an alleged state law claim "relates to" an ERISA plan, such that it would be preempted by § 514(a), before it goes on to ask whether it comes within the narrower scope of § 502(a),[22] such that it would state a claim under ERISA.

*Gronwaldt* presents a strange analytical framework, indeed,[23] but it does not necessarily say what the Eleventh Circuit read it to say. To the extent the *Gronwaldt* court was suggesting that a completely preempted claim must always be dismissed because it inevitably "relates to" an ERISA plan, then the Eleventh Circuit's reading was correct. On the other hand, it is equally plausible that the *Gronwaldt* court was merely suggesting that a claim which goes all the way to stating a claim under § 502(a), such that the defendant could remove to federal court, entitles the plaintiff to continue to prosecute his claim, albeit under the more restrictive substantive and procedural constraints of ERISA. In other words, if the latter reading is correct, although a finding of traditional preemption must be regarded as the first step, or "precondition," to a finding of complete preemption, 155 F.3d at 517, the finding of complete preemption works to undo the preemptive effect of § 514(a), and a claim which begins as a state law claim that would preempted under that section, ends up a viable ERISA claim under § 502(a).

The latter reading, as compared to the Eleventh Circuit's reading, is consistent with the other courts which have held that completely preempted claims are not to be dismissed once in the federal system, but, rather, are to be re-characterized as ERISA claims and treated accordingly. By the same token, the *Butero* and *Lister* holdings are incompatible with the notion that state law claims which seek a remedy available under § 502(a) should actually be construed as claims arising under ERISA from their very inception. *See Taylor,* 481 U.S. at 63–67, 107 S.Ct. 1542. As this Court has observed in the past, "[i]t would defy logic, however, for the Court to allow removal on the basis that the Plaintiffs' Complaint contains federal causes of action, *arising under* ERISA from their inception, and then to grant summary judgment and enter final judgment against the Plaintiffs, because their claims are *preempted by* ERISA." *Erbaugh,* 126 F.Supp.2d at 1082 (emphasis in original).

If the logic of the *Butero* and *Lister* courts were followed, the complete preemption doctrine would be nothing

---

**22.** There is no dispute in the case law that claims which can be brought under § 502(a) constitute a much smaller category of claims than that of claims which "relate to" ERISA plans and are thus traditionally preempted by § 514(a). *See Peters,* 285 F.3d at 468–69; *Warner v. Ford Motor Co.,* 46 F.3d 531, 534–35 (6th Cir.1995).

**23.** As Judge Whipple, of the Western District of Missouri, pointed out in *Tovey v. The Pru-*

*dential Ins. Co. of Am.,* 42 F.Supp.2d 919, 923–24 (W.D.Mo.1999), the Fifth Circuit's analysis set forth in *Gronwaldt* leaves a district court in that circuit, where faced with a removed action, with the counter-intuitive obligation of deciding whether a Rule 12(b)(6) defense exists (i.e., the § 514(a) analysis) before it even addresses the issue of whether it has jurisdiction (i.e., the § 502(a) complete preemption analysis).

more than a vehicle for a defendant to have a federal court dismiss the plaintiff's claim.[24] Complete preemption must mean something more than that a claim is so inherently federal in character that only a federal judge is qualified to dismiss it without any consideration of the merits under ERISA. Indeed it does mean more. Complete preemption means that a claim plead under state law is nevertheless purely a creature of federal law; it is a federal claim from its very inception, such that it *must be* re-characterized as a viable federal claim, actionable in federal court. *See Taylor*, 481 U.S. at 64–66, 107 S.Ct. 1542; *Warner v. Ford Motor Co.*, 46 F.3d 531, 534 (6th Cir.1995); *Bartholet*, 953 F.2d at 1078; *Carland*, 935 F.2d at 1119; *Sorosky*, 826 F.2d at 801; *Murphy*, 152 F.Supp.2d at 758; *Erbaugh*, 126 F.Supp.2d at 1081–82.

Put simply, a defendant cannot remove an action on the basis that it states a claim under ERISA, and then move to dismiss on the basis that it is preempted by ERISA, the very statute which gave it life.

The complete preemption analysis is conducted with reference to § 502(a). If the claim, plead under state law, seeks a remedy available under that section, then it is completely preempted. No subsequent reference to § 514(a) should be made. Even though a claim which could be stated under § 502(a) obviously "relates to" an ERISA plan, once the federal court has determined that § 502(a) governs, it is incongruous to dismiss under § 514(a).[25] *See Tovey v. Prudential Ins. Co. of Am.*, 42 F.Supp.2d 919, 921–25 (W.D.Mo.1999)(explaining the distinction between complete preemption, which is analyzed with reference to § 502(a), and traditional preemption, which is analyzed with reference to § 514(a)). ERISA cannot be both the match which sparks a claim's fire and the bucket of water used to extinguish it.

No better example of the Court's reasoning can be found than the *Nester* case, 162 F.Supp.2d 901. Therein, after having construed the plaintiffs' sole cause of action for breach of contract as one com-

24. Oddly, the Seventh Circuit held that a finding of complete preemption necessarily compels a finding of traditional preemption, and thus dismissal at the federal level, *Lister*, 890 F.2d at 944, even though it recognized in the very same opinion that a mere finding of traditional preemption, but not complete preemption, would compel the district judge to remand the case to the state court, where it presumably would be dismissed pursuant to traditional preemption. *Id.* at 943 n. 1. Its position is inconsistent. Surely, it would be out of character for the Supreme Court of the United States to recognize a doctrine the *sole purpose* of which is to allow the golden wand of a federal judge to dismiss a case which could just as easily have been dismissed in state court. To be sure, the same result has been reached in the Sixth Circuit. *See, e.g., Smith*, 170 F.3d at 615 (upholding dismissal of completely preempted common law claims which "merely attach new, state-law labels to the ERISA claims for breach of fiduciary duty and recovery of benefits"). Notwithstanding outcomes such as that in *Smith*, the argument

against dismissal in such cases has universally been based exclusively on the plaintiff's opposition to a finding that his common law claims "relate to" an ERISA plan (an argument which of course must fail). The argument has never been put to the Sixth Circuit that traditional preemption under § 514(a) is an irrelevant inquiry after complete preemption has been established under § 502(a).

25. Unfortunately, even those courts which recognize that completely preempted claims should not be dismissed under § 514(a) frequently mistake § 514(a) itself as integral to the complete preemption analysis. *See, e.g., Bartholet*, 953 F.2d at 1077; *Carland*, 935 F.2d at 1119. By contrast, the Sixth Circuit has correctly noted that § 514 preemption by itself does not give rise to removal jurisdiction. *See Zuniga v. Blue Cross and Blue Shield of Michigan*, 52 F.3d 1395, 1399 (6th Cir.1995)(citing *Warner*, 46 F.3d at 534–35). Removal is only proper if the claim is one which could have been brought under § 502(a). *See id.*

818

pletely preempted by ERISA, *id.* at 906, the Court went on to consider the merits of the claim pursuant to the substantive and procedural constraints of ERISA review. *Id.* at 906–09. Ultimately, the court held that the plaintiffs were not entitled to benefits, but this holding was based on its ERISA analysis, not on a preemption analysis. The identical circumstance is presented in this case.

Given the Court's finding that Ackerman's claim for breach of contract, in which she alleges that Fortis "breached its obligations to Joyce Ackerman under the terms of the policy, without any justifiable reason for such breach" (Am.Compl.¶ 34), is nothing more than one for benefits due to her under the LTD plan,[26] which is actionable under § 502(a)(1)(B), as codified at 29 U.S.C. § 1132(a)(1)(B), the only question left is whether Ackerman should have to amend her Complaint once more to state this claim expressly.[27]

■ Although the Court has recognized in the past that granting the plaintiff leave to amend to state expressly an ERISA claim is a "prevailing practice," *Erbaugh,* 126 F.Supp.2d at 1082, the practice is not an absolute requirement. Indeed, the Court has at other times simply recognized the existence of the ERISA claim. *See e.g., Carpenter,* Case No. C–3–00–398 (Decision and Entry of March 18, 2002), at 10. *Accord Murphy,* 152 F.Supp.2d at 758 (acknowledging that the courts in the Eastern District of Pennsyl-

vania have sometimes required amended pleadings while at other times have not). Having given this matter some thought, this Court finds granting leave to amend unnecessary. It is unnecessary because Fortis, as demonstrated by its complete preemption argument, is fully aware of the ERISA claim set forth by Ackerman. *See* Fed.R.Civ.P. 8(a) (requiring that a plaintiff give the defendant notice of his ground for relief). As the Seventh Circuit remarked in *Bartholet,* when faced with the same question:

> [The Defendant] argued, and the district court held, that this allegation comes within ERISA. Removal depended on a conclusion that the complaint, *as filed,* arose under federal law. What would be the point of amending the complaint to make explicit what the district judge has held is the only possible interpretation of the document?

953 F.2d at 1078 (emphasis in original).

To summarize, the concept of traditional preemption and that of complete preemption are unique, distinct, and mutually exclusive; as to a single claim, they are incompatible and cannot coexist. Having at first agreed with Fortis that Ackerman's claim for breach of contract is nothing more than a claim for benefits, actionable under § 502(a), the Court cannot regress so as to find the claim preempted by § 514(a). Such a result would amount to nothing short of a finding that the claim is dead on its arrival in

---

**26.** Of course, inherent to the Court's finding that Ackerman's bad faith, intentional infliction of emotional distress, and loss of consortium claims are preempted by § 514(a), under traditional preemption analysis, is the finding that they are not otherwise actionable under § 502(a).

**27.** The Court will reiterate here that Ackerman has not submitted an argument on the question of preemption and dismissal, let alone one on the question of whether she

should be given the opportunity to amend. Her entire argument is directed at the issue of whether the LTD plan was an ERISA plan. The Court has nevertheless undertaken its preemption analysis *sua sponte* on the ground that to dismiss her Amended Complaint for the sole rationale put forward by Fortis would be to add more dirt to the already muddied collection of opinions which have blurred the conceptual distinction between complete preemption and traditional preemption.

federal court; that the ERISA claim preempts itself. The Supreme Court could not possibly have intended such a bizarre result, which serves no other purpose than to waste judicial resources. As with accepted notions of traditional preemption, the state judge, just as easily as the federal judge, would be competent to dismiss the claim in state court. *See Mottley*, 211 U.S. at 152–54, 29 S.Ct. 42. Accordingly, the Court finds that with respect to Ackerman's claim for breach of contract, it must be re-characterized as an ERISA claim, and as to it, Fortis's Motion for Summary Judgment is OVERRULED.

In sum, Fortis's Motion for Summary Judgment is SUSTAINED as to Ackerman's state law claims for bad faith, intentional infliction of emotional distress, and loss of consortium, given that said claims are preempted by ERISA, § 514(a), pursuant to traditional notions of conflict preemption. Fortis's Motion is OVERRULED with respect to Ackerman's claim for breach of contract, re-characterized as it must be as one for benefits under ERISA, § 502(a).[28]

### B. *Procedure Regarding the Review of ERISA Claims*

■ ERISA claims for benefits are to be decided with reference to the adminis-

trative record. *See Wilkins*, 150 F.3d at 619 (Gilman, J.). Because neither party has submitted a memorandum on the merits of the administrative decision regarding Ackerman's claim for benefits, the Court cannot proceed to review that decision at this time. Accordingly, the parties must be afforded the opportunity to do so. Given the fact that Ackerman's sole remaining claim has been re-characterized, and the fact that the Court has no knowledge itself of whether such a claim is one which Ackerman desires to pursue, the prudent thing to do before directing the parties to submit briefs on the merits of the administrative record is to direct Ackerman to inform this Court whether she wishes to proceed with her federal cause of action. Accordingly, she is directed to file with the Court, within 10 days from a date, notice as to whether she wishes to proceed with this litigation. If she responds in the affirmative, the Court will at that time schedule a conference call to discuss a briefing schedule and any other matters necessary to resolve this litigation.

### III. *Conclusion*

For the reasons stated, the Court finds that USAir endorsed the LTD plan such that it must be regarded as an ERISA plan. As to Ackerman's claims for bad faith (First Cause of Action), intentional

---

**28.** Given the parties' diversity, invocation of the complete preemption doctrine is not necessary for establishing removal jurisdiction in this case. Nevertheless, as the above analysis makes clear, at bottom, the doctrine concerns the character of a claim. If a breach of contract claim is one actionable under § 502(a) for purposes of establishing removal jurisdiction, then the same must be true even if jurisdiction exists on some other basis. Otherwise, a plaintiff in state court who had plead a completely preempted state claim would be allowed to proceed under an ERISA cause of action once the defendant had removed to federal court and re-characterized the claim, whereas the identical plaintiff would be dismissed if he had originally filed the identical state claim in a federal diversity action. *Nester* provides a sound example of the proper method of analysis. Therein, the court noted that removal jurisdiction was proper based on diversity, 162 F.Supp.2d at 902 n. 1, such that the complete preemption analysis was unnecessary for purposes of establishing jurisdiction. Nevertheless, recognizing that the *character* of the claim remained at issue, the *Nester* court conducted the complete preemption analysis for purposes of determining how to proceed in its treatment of the claim. The same scenario is presented herein.

infliction of emotional distress (Third Cause of Action), and loss of consortium (Fourth and Fifth Causes of Action), they are preempted by ERISA, and Defendant's Motion for Summary Judgment (Doc. # 8–2) is SUSTAINED. As to Ackerman's breach of contract claim (Second Cause of Action), it is completely preempted, such that it states a viable cause of action under ERISA, and Defendant's Motion is OVERRULED.